No. 15-2234

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————————————

Related Case Nos. 15-2206, 15-2217, 15-2230, 15-2272, 15-2273, 15-2290, 15-2291, 15-2292, 15-2294, 15-2304 and 15-2305

———————————————————

IN RE NATIONAL FOOTBALL LEAGUE PLAYERS CONCUSSION INJURY LITIGATION

Appeal from the United States District Court
For the Eastern District of Pennsylvania
2:14-cv-0029-AB and MDL No. 2323
The Honorable Anita B. Brody

———————————————————

APPELLANT: DARREN RUSSELL CARRINGTON

**OPENING BRIEF OF APPELLANT DARREN RUSSELL CARRINGTON**

Joseph Darrell Palmer, LL.M.
Law Offices of Darrell Palmer PC
2244 Faraday Avenue, Suite 121
Carlsbad, CA 92008
Phone: (858) 215-4064
Fax: (866) 583-8115
darrell.palmer@palmerlegalteam.com
Attorney for Appellant Darren Russell
Carrington

## <u>TABLE OF CONTENTS</u>

I.    JURISDICTIONAL STATEMENT ………………………………….. 1

II.   STATEMENT OF ISSUES …………………………………………..  1

III.  STANDARDS OF REVIEW …………………………………………3

IV.   STATEMENT OF THE CASE ……………………………………… 3

V.    STATEMENT OF FACTS …………………………………………..  5

VI.   ARGUMENT ………………………………………………………… 6

A. THE DISTRICT COURT ERRED IN CERTIFYING
A SETTLEMENT CLASS RIDDLED WITH CLASS
CONFLICT AND LACKING ADEQUATE
REPRESENTATION …………………………………………  7

1. The threshold requirements for class certification of
commonality, typicality and adequate representation
remain crucial in certification of a settlement class
and were not satisfied ………………………………………… 7

2. The District Court erred in determining the class
representatives adequately represented the interests
of class members ……………………………………………… 9

a.  The creation of subclasses did not mitigate
the conflict between current and future claimants ………… 10
b.  Discrete categories of claimants had no separate
Representation …………………………………………   12
c.  The court may not have had jurisdiction over
the claims of class members not currently
alleging any injury, including class
representative Shawn Wooden …………………………   14

3. The court's analysis of the substantive fairness of the
settlement under Rule 23(e) was flawed largely based
on erroneous conclusions of fact related to CTE, and
stemming from the lack of adequate representation of
current and future sufferers from CTE ………………………   15

B. THE DISTRICT COURT ERRED IN APPROVING
A CLASS ACTION SETTLEMENT WHERE LIENS
ASSERTED BY HEALTH INSURERS – GOVERNMENT
OR PRIVATE – MAY SUBSTANTIALLY REDUCE OR
EXTINGUISH MANY CLASS MEMBER PAYMENTS,
AND WHERE THE NOTICE FAILED TO WARN
CLASS MEMBERS ABOUT THESE ISSUES ………………… 17

   1.  The District Court erred in approving the settlement
where third party liens may be so substantial as to
totally extinguish many class members' awards …………  17

   2.  The District Court erred in finding notice adequate
where class members were not warned that
healthcare liens could substantially reduce or
extinguish their settlement awards ………………………… 22

VII.   STATEMENT OF JOINDER IN OTHER
MERITORIOUS BRIEFS …………………………………………… 24

VIII.  CONCLUSION  …………………………………………………  24

CERTIFICATES OF COMPLIANCE …………………………………..  25

CERTIFICATE OF BAR MEMBERSHIP ………………………….  25

# TABLE OF AUTHORITIES

## Cases

*Amchem Products, Inc. v. Windsor*
1 U.S. 591 (1997) ……………………………………………………… 7, 8, 14

*Ark. Dep't of Human Servs. v. Ahlborn*
547 U.S. 268 (2006) …………………………………………………… 18

*Bogosian v. Gulf Oil Corp.*
561 F.2d 434, 449 (3d Cir. 1977) …………………………………………… 9

*DeJulius v. New England Health Care Employees Pension Fund*
429 F.3d 935, 942 (10th Cir.2005) ………………………………………… 3

*Dennis v. Kellogg Co.*
697 F.3d 858, 864 (9th Cir. 2012) ………………………………………… 21

*Devlin v. Scardelletti*
536 U.S. 1 (2002) …………………………………………………………… 1

*Dewey v. Volkswagen AG*
681 F.3d 170, 189 n.19 (3d Cir. 2012) …………………………………… 10

*Fidel v. Farley*
534 F.3d 508, 513 (6th Cir. 2008) ………………………………………… 3

*Georgine v. Amchem Products, Inc.*
83 F.3d 610, 617 (3d Cir. 1996) …………………………………………. 7

*Hecht v. United Collection Bureau*
691 F.3d 218, 222 (2d Cir. 2012) ………………………………………… 23

*In re Asbestos Litigation*
134 F.3d 668, 677 (5th Cir. 1999) ………………………………………… 9

*In re Cendant Corp. Litig.*
264 F.3d 286, 296 (3rd Cir. 2001) ………………………………………… 3

*In re Ins. Brokerage Antitrust Litig.*
618 F.3d 300, 325 n.25 (3d Cir. 2010) …………………………………… 9

*In re Literary Works in Electronic Databases Copyright Litig.*
654 F.3d 242 (2d Cir. 2011) …………………………………………….   13

*In re Warfarin Sodium Antitrust Litig.*
391 F. 3d 516, 532 (3rd Cir. 2004) ……………………………………… 10

*In re Zyprexa Prods. Liab. Litig.*
No. 04–MD–1596, 2005 WL 3117302 (E.D.N.Y. Nov. 22, 2005) ………   22

*In re Zyprexa Prods. Liab. Litig.*
451 F.Supp.2d 458 (E.D.N.Y.2006) ……………………………………… 21

*In re Zyprexa Products Liab. Litig.*
489 F. Supp. 2d 230, 237 (E.D.N.Y. 2007) ………………………………   22

*International Union, UAW v. Mack Trucks, Inc.*
820 F.2d 91, 95 (3d Cir.1987), cert. denied, 499 U.S. 921,
111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) …………………………………    3

*Mullane v. Central Hanover Bank & Trust Co.*
339 U.S. 306, 317 (1950) ………………………………………………… 23

*New England Health Care Emps. Pension Fund v. Woodruff*
512 F.3d 1283 (10th Cir. 2008) …………………………………………… 21

*Oberti v. Board. of Ed. of Borough of Clementon Sch. Dist.*
995 F.2d 1204, 1220 (3d Cir.1993) ………………………………………  3

*Ortiz v. Fibreboard Corp.*
527 U.S. 815 (1999) ………………………………………………………    9

*Phillips Petroleum Co. v. Shutts*
472 U.S. 797, 811-12 & n.3 (1985) ………………………………………23

*Rodriguez v. W. Publ'g Corp.*
563 F.3d 948, 959 (9th Cir. 2009) ………………………………………    9

*Sullivan v. DB Investments, Inc.*
667 F.3d 273, 295 (3rd Cir. 2011) cert. denied,
132 S. Ct. 1876 (2012) ……………………………………………………    2

*Wal-Mart Stores, Inc. v. VISA US.A. Inc.*
396 F.3d 96, 114 (2d Cir. 2005) ………………………………………… 23

*Weinberger v. Kendrick*
698 F.2d 61, 70 (2d Cir. 1982) ……………………………………………  23

*Wos v. EMA Ex Rel. Johnson*
133 S. Ct. 1391 (2013) ……………………………………………………  18

## Codes, Rules and Other Materials

28 U.S.C. § 1291 ……………………………………………………..  1
28 U.S.C. § 1331………………………………………………………..  1
28 U.S.C. § 1332(d)(11) ……………………………………………………  1
28 U.S.C. § 2072(b) …………………………………………………  15
42 U.S.C. § 1395(b)(2) ……………………………………………  17
42 U.S.C. § 1396(a)(25) …………………………………………… 18

Federal Rules of Civil Procedure Rules
    23          ………………………………………………  3, 7, 15
    23(a)        ………………………………………………..  7
    23(a)(4)     ………………………………………………  2, 9, 14
    23(b)(3)     ………………………………………………..  7
    23(e)(1)     ……………………………………………… 23

Federal Rules of Appellate Procedure Rule 28(i) ……………………… 11, 24

## Other Authority:

Class Wars: The Dilemma of the Mass Tort Class Action
John C. Coffee Jr., 95 COLUM. L. REV. 1343, 1443 (1995) …………….  13

For Retirees, Decision on Concussion Settlement Will Not Be a
Simple One:  N.F.L. Concussion Settlement Divides Former Players
Ken Belson, July 22, 2014 ………………………………………………… 20

Fundamental Principles for Class Action Governance
Alexandra Lahav, 37 IND. L. REV. 65, 118-125 (2003) ………………….  23

Manual For Complex Litigation
(4th ed.) § 21.612 ………………………………………………………….  9

## I.     JURISDICTIONAL STATEMENT

The Judicial Panel on Multi-District Litigation ("JPML") consolidated civil actions filed by thousands of former NFL players for pretrial proceedings and asserted removal jurisdiction over certain civil actions filed in state court on behalf of other former NFL players pursuant to 28 U.S.C. § 1331. The District Court had subject matter jurisdiction over the master complaint filed by the Plaintiffs' Steering Committee (the "PSC"), pursuant to 28 U.S.C. § 1332(d)(11).  A.873. The District Court entered a final judgment certifying a class and dismissing the class action complaint on the basis of a settlement of the class action in an order entered on April 22, 2015, and modified on May 8, 2015 and May 11, 2015.  A.58 (Mem. Op., Apr. 22, 2014)0, A.40 (Am. Final Order & J., Apr. 22, 2015); A.47 (Am. Final Order & J., May 8, 2015); A.55 (Order, May 11, 2015).

Appellant Objector Darren Russell Carrington, a class-member who objected to approval of the settlement (A.3103), has standing to appeal final approval of the class action settlement without the need to formally intervene.  *Devlin v. Scardelletti,* 536 U.S. 1 (2002).  Carrington filed a timely notice of appeal on May 15, 2015 (A.9) and an Amended Notice of Appeal on May 27, 2015.   A33.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## II.     STATEMENT OF ISSUES

Did the Court err when it certified a settlement class including two subclasses where conflicts of interest and disparate facts prevented a finding of commonality or typicality under Rule 23(a).

*These issues were raised by Carrington in his objection to the settlement and through joinder in the objections of the co-appellants. A.3103.   These objections were overruled in the district court's opinion. A. 58.*

1

Did the court err in determining the Rule 23(a)(4) adequacy of representation was satisfied where the class representatives expressly disavowed any need to provide compensation for either CTE or the bulk of the symptoms associated with early stage CTE and where separate categories of claimants received no separate representation?

> *These issues were raised by Carrington in his objection to the settlement and through joinder in the objections of the co-appellants. A.3103. These objections were overruled in the district court's opinion. A. 58.*

Did the District Court err in approving a settlement where third party liens may be so substantial as to totally extinguish many class members' awards?

> *These issues were raised by Carrington in his objection to the settlement and through joinder in the objections of the co-appellants. A.3103. These objections were overruled in the district court's opinion. A. 58.*

Did the District Court err in finding notice adequate where class members were not warned that healthcare liens could substantially reduce or extinguish their settlement awards?

> *These issues were raised by Carrington in his objection to the settlement and through joinder in the objections of the co-appellants. A.3103. These objections were overruled in the district court's opinion. A. 58.*

## III.   STANDARD OF REVIEW

A district court's approval of a class action settlement is reviewed for abuse of discretion. *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 295 (3rd Cir. 2011), cert. denied, 132 S. Ct. 1876 (2012). An appellate court may find an abuse of discretion where the "district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to

fact." *International Union, UAW v. Mack Trucks, Inc*., 820 F.2d 91, 95 (3d Cir.1987), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court, based on the entire evidence, concludes with firm conviction that a mistake has been made. *Oberti v. Board. of Ed. of Borough of Clementon Sch. Dist*., 995 F.2d 1204, 1220 (3d Cir.1993). The court, serving as a "fiduciary," has an obligation to protect the entire class. *In re Cendant Corp. Litig*., 264 F.3d 286, 296 (3rd Cir. 2001). "[W]hether a particular class action notice program satisfies the requirements of Fed.R.Civ.P. 23 and the Due Process Clause" is reviewed "de novo." *Fidel v. Farle*y, 534 F.3d 508, 513 (6th Cir. 2008), *citing DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 942 (10th Cir.2005).

## IV.   STATEMENT OF THE CASE

Despite growing evidence to the contrary, the NFL denied that football injuries increased the risk of brain injury for decades. Following discovery of CTE in certain deceased football players, and after scientists determined that football players have an extraordinarily high risk of developing CTE, multiple lawsuits were filed against the NFL. The NFL entered into this settlement at a time when scientific understanding of the risks of traumatic brain injury was increasing dramatically. Shockingly, this settlement will forever release the NFL from liability for all future CTE diagnoses in retired players, but provides no compensation for class members diagnosed with CTE after final approval.

As part of its final approval order, the District Court certified a settlement class including retired football players who have already died with a diagnosis of CTE, and retired players who currently suffer from no injury at all. During the settlement two subclasses were created to account for the differing interests of

3

those with current diagnoses (including deceased players whose autopsies showed the presence of CTE and other neurological diseases including ALS, Alzheimer's and Parkinson's) and those without any current diagnosis. Compensation is offered to those currently diagnosed with ALS, Parkinson's, Alzheimer's or Dementia, and again those who have no such diagnosis now, but might in the future. The settlement's compensation program (and release from liability) stretches 65 years into the future. Players who have already died with CTE will receive $4 million, those who die of CTE after final approval of the settlement will receive nothing.

Although the class was divided into two subclasses for current and future claimants, the range of diverse needs and injuries included in these groups were not separately represented in settlement negotiations. The court failed to recognize that intra-class conflicts prevented certification of a settlement class, even with the creation of subclasses. The result is startling; a settlement that provides millions in compensation to the families of already deceased football players whose autopsies determined they suffered from CTE, but no compensation at all for players diagnosed with CTE in the future. A player who dies this summer whose autopsy reveals CTE will receive nothing from the settlement. Attempting to minimize this shocking unfairness, the parties claim compensation for dementia symptoms are sufficient, despite the low level of compensation offered for mild dementia and leaving aside that early symptoms of CTE do not include dementia. The court's determination of the fairness of the settlement failed to take account of the overall unfairness of the settlement, particularly as regards its compensation for CTE.

The court also failed to adequately recognize the degree to which uncertainties surrounding the resolution of healthcare related liens render the settlement unfair and *unfinished*. Plaintiffs' counsel have just begun the process of

4

resolving these liens.  The settlement should not have been approved prior to accomplishing this.

Failing to recognize the deep divisions within the settlement class, the District Court erroneously approved the settlement over the objections of more than 200 class members, many of which included extensive briefings by leading scientists.   Public interest organizations such as Public Citizen and the Brain Injury Association of America filed amicus briefs advocating the court deny final approval of the settlement.  Overruling the objections, the court approved the settlement.

## V.   STATEMENT OF FACTS

In the interests of judicial economy we incorporate by reference the statement of facts included in the briefs of (1) Jimmie H. Jones, Ricky Ray and Jesse Solomon (Appeal No. 15-2291), and (2) Alan Faneca, Roderick "Rock Cartwright, Jeff Rohrer and Sean Considine (Appeal No. 15-2304).   We highlight the following relevant facts as discussed herein:

Former players began filing lawsuits against the NFL for harm resulting from repeated traumatic brain injuries starting in July 2011.  A61. At the request of the NFL these lawsuits were consolidated for pretrial proceedings in the Eastern District of Pennsylvania.  The District Court issued various case management orders, and plaintiffs submitted a proposal for a Plaintiff's Steering Committee to direct litigation for the plaintiffs.  The court approved the structure and appointed co-lead counsel.  The court directed the filing of a master complaint and short form complaints for individual players.  In July 2013 the court directed the parties to participate in settlement discussions.  The court did not certify a class action and the mediator did not initially direct formation of subclasses or otherwise address the protection of the differing interests of currently injured or future claimants.  On

5

August 29, 2013 the parties announced a term sheet for a settlement agreement which included a settlement fund of $760 million consisting of a monitoring program ($75 million), an education fund ($10 million), and a fund to pay monetary awards for "qualifying diagnoses". A.956.

During the mediation (and not before) the parties agreed to create two separate subclasses. Two members of the PSC were designated to serve as subclass counsel. The District Court did not oversee the selection of subclass representatives or subclass counsel. Future claimants were initially represented by Corey Swinson (who had played only one year in the NFL and who was not a party in any of the lawsuits consolidated in the MDL). Mr. Swinson passed away in September of 2013, and was replaced by Shawn Wooden (who had also only played in the NFL for one year). Mr. Wooden was appointed class representative after he agreed to support the settlement. The District Court determined that "Wooden and Turner did not actively participate in settlement negotiations." A.91. The parties did not attempt to resolve issues related to healthcare liens on the settlements prior to seeking final approval of the settlement.

## VI.    ARGUMENT

In the interests of judicial economy we specifically incorporate by reference (1) the arguments of appellants Jimmie H. Jones, Ricky Ray and Jesse Solomon (Appeal No. 15-2291), made in their brief filed August 13, 2015; (2) the arguments of Alan Faneca, Roderick "Rock Cartwright, Jeff Rohrer and Sean Considine (Appeal No. 15-2304), found in sections I through III of their brief filed August 19, 2015; and the (3) the amicus curiae brief of the Brain Injury Association Of America filed August 20, 2015, and in addition we further argue as follows:

## A. THE DISTRICT COURT ERRED IN CERTIFYING A SETTLEMENT CLASS RIDDLED WITH CLASS CONFLICT AND LACKING ADEQUATE REPRESENTATION

### 1. *The threshold requirements for class certification of commonality, typicality and adequate representation remain crucial in certification of a settlement class and were not satisfied.*

The problems with this settlement begin at Rule 23(a) and are fundamental: the court erred in finding sufficient commonality in a class including both current and future claimants. The lessons of the Supreme Court's ruling in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), affirming with some modification this court's ruling in *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 617 (3d Cir. 1996), are dispositive. *Amchem* instructed that the certification requirements of Fed. R. Civ. Proc. Rule 23, must be satisfied prior to a determination of the fairness of a settlement under Rule 23(e). "[S]pecifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, *even heightened*, attention in the settlement context." *Amchem*, at 620. (emphasis added) Rule 23 (a) and (b) prevent "certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness." *Id.* at 621.

*Amchem* clarified the connection between the threshold requirements of Rule 23(a) (especially commonality and typicality) and the Rule 23(b)(3) requirement that common questions predominate over any questions affecting only individual members. In *Amchem*, the district court had found common questions predominant based on "shared experience of asbestos exposure and class members' common "interest in receiving prompt and fair compensation for their claims, while minimizing the risks and transaction costs inherent in the asbestos litigation process." These findings were insufficient. *Amchem*, at 622.

Similarly, the District Court here found predominance based on the common

factual questions raised by the NFL Parties' knowledge and conduct and found common injury in that the retired players returned to play prematurely after head injuries.  A.100. The court minimized the vast differences in the nature and extent of the injuries suffered by class members (both between and within the subclasses). Instead the court determined, "Predominance exists even though these hits resulted in different symptoms with different damages."  A.100.

Respectfully, the District Court did not fully appreciate the importance of conflicts within the class.  Similar conflicts prevented certification in *Amchem*.

> Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma.... Each has a different history of cigarette smoking, a factor that complicates the causation inquiry.

*Amchem*, 521 U.S. at 624.

The same types of differences destroy the commonality here.  The retired NFL players experienced different injuries over different periods.  Some have no current symptoms of brain injury, while others have debilitating injuries or have died as a result of their injuries.  Even more to the point, in *Amchem* both the Supreme Court and the Third Circuit highlighted the stark differences between currently injured class members and those with only possible future injuries. Common issues did not predominate in *Amchem* because:

> "The [exposure-only] plaintiffs especially share little in common, either with each other or with the presently injured class members. It is unclear whether they will contract asbestos-related disease and, if so, what disease each will suffer. They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories."

*Id.* at 626.  Simply replace "asbestos-related disease" in the above quotation

with "brain trauma related disease" and the court could have been describing the problems in the current settlement.

### 2. *The District Court erred in determining the class representatives adequately represented the interests of class members.*

The court also failed to ensure adequate representation of class members, the subclasses, and discrete groups within the subclasses. Rule 23(a)(4) requires class representatives "fairly and adequately protect the interests of the class." The adequate representation requirement cannot be satisfied through sham or largely symbolic representation. *See Bogosian v. Gulf Oil Corp*., 561 F.2d 434, 449 (3d Cir. 1977) abrogated on unrelated grounds by *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 325 n.25 (3d Cir. 2010) which requires that "representatives and their attorneys competently, responsibly and vigorously prosecute the suit.". "An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy" under Rule 23(a)(4). *Rodriguez v. W. Publ'g Corp*., 563 F.3d 948, 959 (9th Cir. 2009). "A representative must 'possess the same interest and suffer the same injury as the class members' and must be aligned in interest such that no conflicts exist between the representative and any 'discrete subclasses' within the broader class he purports to represent." *In re Asbestos Litigation*, 134 F.3d 668, 677 (5th Cir. 1999) (Smith, J. dissenting) (quoting *Amchem*), *rev'd sub nom. Ortiz v. Fibreboard Corp*., 527 U.S. 815 (1999). *Accord* MANUAL FOR COMPLEX LITIGATION (4th ed.) § 21.612. A finding of adequate representation requires "structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627.

Although the court acknowledged it should "seek to uncover conflicts of interest between class representatives and the class they represent," [A.85, *citing In*

9

*re Warfarin Sodium Antitrust Litig.*, 391 F. 3d 516, 532 (3rd Cir. 2004)], it did not sufficiently recognize latent conflicts of interest among the class members.   The subclasses created in the course of settlement negotiations did not even begin to address the diverse categories of injured class members, including but not limited to those either at risk of or currently suffering from CTE.

### a) The creation of subclasses did not mitigate the conflict between current and future claimants.

The creation of subclasses was flawed procedurally: it was an afterthought, created during the course of settlement negotiations in which separate groups of players had no representation.  The PSC was a single body acting on behalf of all plaintiffs that created subclasses in the course of the mediation and designated two of its members as counsel for the subclasses.  A.1116.

The District Court acknowledged that the class representative did not participate in settlement negotiations.  A.91.  The untimely death of the first class representative, Corey Swinson, changed little ,as nothing in the record indicated that Mr. Swinson participated in the mediation (counsel's assertion to the contrary notwithstanding).  Shawn Wooden was only added as a representative party after conclusion of the settlement negotiations and after agreeing to the basic terms of the settlement, and has acknowledged he played no role in settlement negotiations.

Mr. Wooden did not adequately represent the interests of all future claimants because he agreed to a settlement that guaranteed high levels of compensation to class members diagnosed with relatively rare diseases including ALS and Parkinson's, but zero compensation for the disease giving rise to the litigation: CTE.  Although all future claimants will get medical monitoring having some minimal individual value, they will receive *nothing* if they die with CTE or if they are diagnosed with CTE while living.

10

Nor did Mr. Wooden even allege that he was at risk of developing CTE. The revised complaint filed on January 10, 2014 does not include allegations that Mr. Wooden was at increased risk for developing CTE – although this is the issue underlying nearly every lawsuit consolidated in this action. A.1126. Mr. Wooden's declaration in support of final approval is also silent as to his increased risk of developing CTE. A.3823. This is a key omission in litigation brought about because of the recognition that repetitive injuries on the football field causes CTE. Although CTE is a new disease, it is not speculative and its existence is well established by prominent scientists at leading research institutions based on striking empirical evidence. A.2370 (finding CTE in 76 out of 79 autopsies performed on the brains of former NFL players). See also Opening Brief of Appellant Scott Gilchrist, Appeal No. No. 15-2290.[1] Mr. Wooden's agreement to release all claims related to CTE for zero compensation at the very least raises an inference that he failed to adequately inform himself as to the substantial body of developing research regarding the presence of CTE in football players.

Kevin Turner is the class representative for players with current injuries. Mr. Turner currently suffers from ALS, the most highly compensated qualifying diagnosis. Mr. Turner's claims are not typical of most of his fellow class members, however, as the risk of acquiring ALS is extremely low in comparison to the risk of suffering from dementia or CTE. A.1604. Like Mr. Wooden, Mr. Turner failed to allege a risk of acquiring CTE and hence did not adequately protect the interests of current claimants, many of whom are no doubt already suffering from CTE. (See Opening Brief of Jimmie Jones, et al in Appeal No. 15-

---

[1] Pursuant to Fed. R. App. Proc. Rule 28(i), we join specifically in the Opening Brief of Appellant Scott Gilchrist, filed on August 14, 2015 and incorporate by reference its arguments regarding the faulty approach taken towards scientific information by the District Court.

2291 at page 2, describing Jesse Solomon's diagnosis as probably suffering from CTE). Mr. Turner's claims are not typical of his class so he cannot possibly serve as an adequate representative. His claims are instead they only representative of the narrow portion of the class diagnosed with ALS.

### b) *Discrete categories of claimants had no separate representation.*

The division into subclasses also failed to reflect the conflicting interests within the subclasses. When a settlement explicitly recognizes separate categories of claimants and provides differing compensation related to those different categories, separate representation is indicated.

- This settlement provides very different levels of compensation for different illnesses, ranging from Level 1.5 neurocognitive impairment (with a maximum award of $1.5 million), Level 2 neurocognitive impairment (with a maximum award of $2 million), Parkinson's or Alzheimer's Diseases (each with a maximum award of $3.5 million), Death with CTE (with a maximum award of $4 million), and ALS (with a maximum award of $5 million). Claimants suffering from each of these different diseases have different and competing interests. A.1395.

- In addition, Section 6.7(b) of the Settlement Agreement sets forth a series of offsets and reductions which further exacerbate the differences within the subclasses. Awards will be reduced for having played with the NFL for less than five seasons (6.7(b)(i), being over age 45 at time of diagnosis (see Exhibit B-3 to Settlement Agreement, A.1478), for having experienced a stroke (a 75% reduction) (6.7(b)(ii)), for having had a single other traumatic brain incident

12

(again a 75% reduction) (6.7(b)(iii)), etc.  These reductions and offsets were negotiated without any representation of the differing interests.  A.1394.

Any settlement that awards compensation by disease or injury category runs the risk of intra-class conflict. Professor Coffee's analysis from two decades ago highlighted the problems with such an approach.

> class counsel has explicitly traded off the interests of subclasses against each other, obtaining substantial compensation for one subclass in return for a waiver of cash compensation by another. In such multiparty negotiations between the defendants and different subclasses of plaintiffs, even the well-meaning plaintiffs' attorney shifts inevitably from the role of an advocate and adviser for clients to the role of a philosopher king, dispensing largess among his client subjects… These intra-class trade-offs are, however, an endemic problem that transcends the asbestos context. Any settlement that awards compensation by disease or injury classification creates potential allocation issues: should the compensation for one subclass be raised and correspondingly that for another lowered?

John C. Coffee Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1443 (1995).  Nor does it even matter if the awards to each category of claimant seem fair or reasonable.  Where a class fails on a structural level, it must be vacated without regard to whether "the class members' interests were not actually damaged." *Dewey v. Volkswagen AG*, 681 F.3d 170, 189 n.19 (3d Cir. 2012).

*In re Literary Works in Electronic Databases Copyright Litig*., 654 F.3d 242 (2d Cir. 2011) is analogous.  Class counsel in that case attempted to negotiate compensation from Google for three separate "categories" of class members in a single settlement class action.  *Id.* at 246.  Each category received a different damages formula.  *Id.* As in this case each class representative "served generally as representative for the whole, not for a separate constituency."  *Id.* at 251 (quoting

13

*Amchem*, 521 U.S. at 627). The Second Circuit did not dispute that each category had differently valued claims; nor did it make any finding that the compensation negotiated for any category was unfair or inadequate. Nevertheless, the settlement was stricken on Rule 23(a)(4) grounds because the court found the class representatives "cannot have had an interest in maximizing compensation for every category." *Id.* at 252. The same result is necessary here.

When a portion of the class lacks representation, the Rule 23(a)(4) failure cannot be solved by claiming "no harm, no foul". The separation into two subclasses did not adequately address the serious intra-class conflicts. The creation of sub-classes was an afterthought. The class representatives were not designated so as to ensure aggressive negotiation on behalf of the sub-classes, but served only to affirm a deal that had already been reached between the parties.

### c) The court may not have had jurisdiction over the claims of class members not currently alleging any injury, including class representative Shawn Wooden.

In *Amchem* the court did not reach the question of whether exposure-only claimants had standing to sue because it found the certification questions antecedent. The *Amchem* objectors had argued that the court's exercise of jurisdiction over individuals who had not yet alleged injury was not justiciable under Article III of the U.S. Constitution, and that exposure-only claimants lack standing to sue because they had not yet sustained any cognizable injury or met the then current amount-in-controversy requirement (in excess of $50,000) specified for federal-court jurisdiction based upon diversity of citizenship. The Third Circuit declined to reach these issues because they "would not exist but for the [class-action] certification." 83 F.3d at 623. The Supreme Court agreed that "[t]he class certification issues are dispositive, *ibid.*; because their resolution here is logically antecedent to the existence of any Article III issues, [and found] it [was]

appropriate to reach them first" (declining to resolve definitively question whether the court had jurisdiction over the uninjured class members).

Should the court not find the class certification issues dispositive, however, we point the court to the Supreme Court's comment that "Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure "shall not abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b)." *Amchem*, at 613-614.

**3. *The court's analysis of the substantive fairness of the settlement under Rule 23(e) was flawed largely based on erroneous conclusions of fact related to CTE, and stemming from the lack of adequate representation of current and future sufferers from CTE.***

In the interests of judicial economy we incorporate by reference the analysis of the overall fairness of the settlement, including the court's analysis of the Girsh factors found in Section III of the brief of Alan Faneca, et al., (Appeal No. 15-2304) filed August 19, 2015, adding the following arguments:

Despite the prevalence of CTE among former NFL players, this settlement only provides monetary compensation for CTE to families of former players who died before the court's final approval of the settlement. The court preliminarily approved a settlement cutting off recovery for death with CTE at the date of the preliminary approval hearing, but following receipt of objections the court extended that cut-off date to the date of the final approval hearing. This date remains arbitrary. Former players who die of CTE just two weeks later get nothing. Players currently suffering from CTE get nothing. Players who die from CTE many years from now will get nothing for their CTE – even if in the future CTE can be diagnosed during their lifetime. Carrington's objection pointed to several current studies aimed at identifying CTE in living subjects, suggesting diagnosis of CTE in living subjects may not be far off. A.3103.

15

The Parties are also hiding the fact that CTE sufferers will not be compensated. Carrington's objection pointed out that class counsel's public remarks in connection with this settlement have attempted to obscure the fact that CTE sufferers will not be compensated, and indeed the NFL has implied in press interviews that those currently suffering from CTE would qualify based on their symptoms. But this is not true. Many CTE sufferers do not meet the diagnostic criteria for dementia, and never will. CTE and dementia are not equivalent, and they do not receive equal compensation under the settlement. Carrington's objection pointed to a story by David Steele which quoted class counsel Chris Seeger as follows:

> "CTE is not a relevant marker for anything in this settlement. It's the symptoms— if you have all the symptoms that are related to CTE, or the diseases that are related, like dementia and Alzheimer's and ALS, then that determines it," said Christopher Seeger, the co-lead counsel for the more than 5,000 players in the settlement.

Available at http://www.sportingnews.com/nfl/story/2014-07-14/nfl-concussions-lawsuit-cte-symptoms-eligible-settlement-tony-dorsett-wycheck-seeger. A.3103. Any analysis of this issue must lead to the conclusion that the settlement as negotiated is not fair to the vast majority of class members who currently suffer from the devastating effects of CTE or are at very high risk of developing CTE.

The court erred in finding the class was adequately represented as required by Rule 23(a)(4) where the class representative for the sub-class of future claimants expressly disavowed any need to provide compensation for either CTE or the bulk of the symptoms associated with early stage CTE, and where more generally the subclasses did not reflect the diverse range of interests of class members included in each subclass.

16

**B. THE DISTRICT COURT ERRED IN APPROVING A CLASS ACTION SETTLEMENT WHERE LIENS ASSERTED BY HEALTH INSURERS – GOVERNMENT OR PRIVATE – MAY SUBSTANTIALLY REDUCE OR EXTINGUISH MANY CLASS MEMBER PAYMENTS, AND WHERE THE NOTICE FAILED TO WARN CLASS MEMBERS ABOUT THESE ISSUES.**

> **1. *The District Court erred in approving the settlement where third party liens may be so substantial as to totally extinguish many class members' awards.***

Resolution of healthcare related liens for both subclasses will be a huge issue in administration of this settlement, and will determine the extent – if any – to which class members are able to recover.  As this settlement includes payment for injuries having a high likelihood of requiring long term custodial care (which could eat up an individual claimants' entire award), failure to include either a resolution of the liens or an offer by defendant to satisfy the liens prevents any finding that this is a reasonable settlement.  Moreover, the failure to notify class members of the lien issues is a fatal flaw.

The sad reality of this settlement is that many players' compensation will be drastically reduced by Medicare or Medicaid liens.  Individuals suffering from crippling diseases like those giving rise to this lawsuit may require years of nursing care, in addition to medical treatment. Payments expended by state or local governments to cover that care can be recovered from the settlement awards.  The Medicare and Medicaid statutes include provisions making tortfeasors primary payers in a settlement context.  The Medicare Secondary Payer Act, 42 U.S.C. § 1395(b)(2) provides that:

> "Payment under this subchapter may not be made, . . . with respect to any item or service to the extent that— (i) payment has been made, or can reasonably be expected to be made, with respect to the item or service … or (ii) payment has been made  or can reasonably be expected to be made under a workmen's compensation law or. . . liability insurance policy or plan (including a self-insured plan).

17

The Medicaid Secondary Payer statute, 42 U.S.C. §1396a(a)(25), likewise provides that Medicaid is a payer of last resort for a Medicaid beneficiary's medical costs, so that other responsible parties (such as tortfeasors or insurers) are primary. Medicaid is also a chief provider of nursing home care, which can run over $100,000 per year.

Until recently, Supreme Court precedent limited Medicaid recovery in a tort settlement to the portion of the settlement or judgment allocated to health care items or services. Over the years, states have attempted to recover greater amounts from tort settlements, but the Supreme Court has consistently held that the Medicaid Secondary Payer statute limited state Medicaid programs' recovery to an allotted share of medical costs only, restricting their ability to recover amounts allocated to pain and suffering or lost wages or other components of a settlement. *See, e.g., Ark. Dep't of Human Servs. v. Ahlborn*, 547 U.S. 268 (2006), (only portion of settlement representing payment for past medical expenses could be claimed by state for Medicaid payments), and *Wos v. EMA Ex Rel. Johnson*, 133 S. Ct. 1391 (2013) (striking down North Carolina statute requiring up to one-third of tort damages award be paid to state as reimbursement for medical treatment provided through Medicaid).

Changes to the Medicaid law found in section 202(b) of the Bipartisan Budget Act of 2013 removed the previous limitations on Medicaid recovery. The new legislation replaced the phrase "payment . . . for such health care items or services" with the words "any payments by such third party." So, while under previous law states could only recover that portion of a settlement award allocated to "health care items and services," under the current law states can recover "any payments" made to a Medicaid beneficiary as part of a tort settlement. This amendment greatly expands the Medicaid Secondary Payer statute to allow states to recover funds from a judgment or settlement beyond the costs of medical items

18

or services.  As a result of these recent changes, states have a virtually unlimited right to recovery from settlements with Medicaid beneficiaries.

The settlement agreement acknowledges the existence of government liens. Article XI of the Settlement Agreement explains that state and federal governments have the right to recover expenses associated with treatment for a player's illness. A.1417. By way of explanation, if a player were eligible for a $500,000 award, but Medicare had paid $200,000 to treat his condition and asserted a $200,000 lien, the player would receive only $300,000.  Unfortunately, the government's lien might far exceed the award under the settlement as well.

The possibility that a lien might be greater than the settlement award is addressed explicitly at Section 11.1(b) regarding "Roles and Responsibilities." This provision states that "The Lien Resolution Administrator will, among other responsibilities set forth in this Settlement Agreement, administer the process for the identification and satisfaction of all applicable Liens, as set forth in Section 11.3.  Each Settlement Class Member (and his or her respective counsel, if applicable) claiming a Monetary Award or Derivative Claimant Award, however, will be solely responsible for the satisfaction and discharge of all Liens." A.1417.

Medicare liens will be particularly complicated to negotiate in this settlement because the awards are meant to cover future medical expenses.  Unlike a typical auto accident where most of the medical expenses have been incurred at the time of settlement, awards under this settlement will be determined before the bulk of the medical bills are incurred.  The higher awards available under this settlement will accrue as soon as a player is diagnosed with a qualifying disease, at a time when the class member's future medical expenses cannot be known with any certainty.

Section 11.3(f) of the settlement agreement highlights the issue regarding future payments, expressly referencing "past, current, or future bills or costs."

19

A.1418. Section 11.3(g) of the agreement forbids any payments from the settlement fund until a class member's medical liens have been satisfied, indicating the need for set asides to cover health care costs.. A.1418. Because of the uncertainty of future medical payments, the settlement funds may largely be locked in Medicare or Medicaid set-aside accounts throughout the players' lifetimes.

The uncertainties surrounding the portion of payments that will go to satisfy medical liens are a key problem in this settlement. As Carrington noted in his objection, class counsel Chris Seeger has minimized this issue in the press.

> Seeger was quoted in a New York Times article as saying that in other settlements he had worked on, he negotiated a fixed deduction that was drastically lower than the amount that the recipients owed. The government, he said, prefers the certainty of receiving small amounts from every recipient rather than spending years trying to claw back money from many people. "The government likes these deals because rather than chasing these people individually, they can receive a fixed amount for each disease," he said. See Ken Belson, "For Retirees, Decision on Concussion Settlement Will Not Be a Simple One: N.F.L. Concussion Settlement Divides Former Players," July 22, 2014, available at: http://www.nytimes.com/2014/07/23/sports/football/nfl-concussion-settlement-divides-former-players.html?_r=0.

A.3103. Seeger's comments are somewhat disingenuous in this context, however, as no such fixed deduction has been negotiated.[2]

The District Court's review of this issue was flawed first in that the court

---

[2] Chris Seeger is well aware of the complex issues surrounding third party payers as his biography on his law firm's website states he was lead counsel in the consolidated action on behalf of the International Union of Operating Engineers Local #68 Welfare Fund and other similarly-situated third-party payers in their suit against Merck to recover money that they paid for Vioxx prescriptions. *See* http://www.seegerweiss.com/attorneys/partners/christopher-a-seeger#horizontalTab1

failed to acknowledge that Carrington raised the issue, and instead only pointed to objections raised in the Amicus Curiae Brief of Public CitizenA.184.   Carrington, however, raised this issue as a real party.  A.3108. The court's failure to even acknowledge Carrington's objection is itself problematic.[3]  Adding insult to injury, the District Court summarily disposed of the issue by claiming "the Lien Resolution Program that accompanies these provisions is a substantial benefit for Class Members. The Lien Resolution Program will streamline this process and ensure that Class Members receive Monetary Awards as quickly as possible  . . .." A.185.

First, although the settlement provides for the position of Lien Resolution administrator, it does not guarantee class members any rewards upon conclusion of that process.  The court cited to *In re Zyprexa Prods. Liab. Litig.*, 451 F.Supp.2d 458 (E.D.N.Y.2006), which approved a national system for resolution of Medicare and Medicaid Liens, as indicating the settlement's approach was fair.  Review of the *Zyprexa* litigation should, however, have alerted the court of the need for caution.  *Zyprexa* suggests that this settlement will likely be followed by a further round of litigation related to resolution of the liens.

---

[3] "To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis v. Kellogg Co*., 697 F.3d 858, 864 (9th Cir. 2012) (internal quotations omitted). The District Court's failure here is identical to the reversible error in *New England Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283 (10th Cir. 2008). In *New England Health Care*, the Tenth Circuit reversed the approval of a class action settlement in a securities fraud case where the district court had summarized the contentions of the non-settling defendants and then "simply 'overruled'" their objections.  The Tenth Circuit held such cursory examination to be "insufficient" because it did not allow the appellate court "to know the path the district court followed." *Id*.  Here, it appears the court may not have even reviewed each of the multiple objections to this settlement.

In *Zyprexa*, the defendant entered into a settlement covering some 8,000 individual plaintiffs in 2005. *See In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2005 WL 3117302 (E.D.N.Y. Nov. 22, 2005). The settlement was followed by a second and larger wave of litigation involving literally thousands of lawsuits brought by third parties – health insurance companies, unions and others seeking compensation for reimbursements they had made, including state and federal governments which sought reimbursement for moneys spent through Medicare and Medicaid. The second wave of litigation eventually led to the opinion referenced in the District Court's opinion, not the initial settlement and appointment of a lien resolution administrator. 451 F.Supp.2d 458. *See In re Zyprexa Products Liab. Litig.*, 489 F. Supp. 2d 230, 237 (E.D.N.Y. 2007) (summarizing the history of the *Zyprexa* litigation).

Here, the parties have not reached any resolution regarding the Medicare and Medicaid liens, and have rather attempted to transfer ultimate responsibility for those liens to the injured players. Without some resolution as to the extent of the liens, it was an abuse of the court's discretion to approve this as yet extremely unsettled settlement.

### 2. *The District Court erred in finding notice adequate where class members were not warned that healthcare liens could substantially reduce or extinguish their settlement awards.*

The notice to the class did not mention Medicare or Medicaid. The only mention of liens was a brief statement in the long form notice at question 16 (addressing how much money the class member will receive). The answer mentions possible reductions in recovery based on "any legally enforceable liens on the award." A.1542. This general statement is sufficiently imprecise that a class member reviewing the notice might interpret it as referring to tax liens, or liens imposed in a bankruptcy proceeding. This statement does not put class

22

members on notice that healthcare liens, either from private health insurers, Medicare or Medicaid could substantially reduce the portion of the award the player might ultimately receive.  This brief reference does not "fairly apprise" class members of the very real issues surrounding resolution of health care related liens.

Rule 23(e)(1) states notice must be provided in a "reasonable manner" i.e., it must "`fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" *Wal-Mart Stores, Inc. v. VISA US.A. Inc*., 396 F.3d 96, 114 (2d Cir. 2005) (*quoting Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982).  The principle enunciated in *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 317 (1950) sixty five years ago underscores that the notice requirement is more than symbolic.  "But when notice is a person's due, process which is a mere gesture is not due process."  *Mullane* at 314-315.

"Absent class members have a due process right to notice and an opportunity to opt out of class litigation when the action is 'predominantly' for money damages."  *Hecht v. United Collection Bureau*, 691 F.3d 218, 222 (2d Cir. 2012), *citing Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 & n.3 (1985). Adequate notice, which informs class members of essential aspects of a settlement, is essential to the fairness of class action settlements.  *See, e.g*., Alexandra Lahav, *Fundamental Principles for Class Action Governance*, 37 IND. L. REV. 65, 118-125 (2003) (observing that "The first and perhaps most important principle for class action governance is the disclosure principle.  This principle requires that material information be disclosed to class members, objectors, and judges.")

The failure to make meaningful disclosures regarding the impact of the Medicare and Medicaid Secondary Payer laws is so significant that this provides an independent basis for requiring that the class be re-noticed.

## VII.  STATEMENT OF JOINDER IN OTHER MERITORIOUS BRIEFS

As permitted pursuant to Fed. R. App. Proc. Rule 28(i), appellant herein joins in all meritorious briefs filed by appellants in this consolidated appeal in addition to and including those specifically referenced herein. In particular we join in the arguments of co-appellants:

Appellant Scott Gilchrist (No. 15-2290)

Appellants Jimmie H. Jones, et al. (No. 15-2291)

Appellant Andrew Stewart (No. 15-2292)

Appellants Alan Faneca, et al. (No. 15-2304)

Appellants Craig and Dawn Heimburger (No. 15-2206)

Appellant Curtis Anderson (15-2230)

Appellant Scott Gilchrist (No. 15-2290)

Appellants Cleo Miller, et al (No. 15-2217)

We further join in the arguments advanced in the amicus curiae brief filed by Brain Injury Association of American, and all other meritorious briefs filed in support of Appellants.

## VIII.  CONCLUSION

The District Court's orders approving the settlement and dismissing lawsuits filed by thousands of individual NFL players should be reversed.


Dated: August 24, 2015                    Law Offices of Darrell Palmer PC


                                          /s/ Joseph Darrell Palmer_____
                                          Joseph Darrell Palmer
                                          Attorney for Appellant Darren Carrington


24

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that the attached brief was produced in Times New Roman (a proportionately-spaced typeface), has a typeface of 14 points and contains 7,094 words.

## CERTIFICATE OF IDENTITY BETWEEN ELECTRONIC AND PAPER COPIES

I certify that, pursuant to Third Circuit Local Rule 31.1(c), that the text of the electronic brief filed with the Court is identical to the text in the paper copies.

## CERTIFICATE OF VIRUS SCAN

I certify, pursuant to Third Circuit Local Rule 31.1(c), that a virus detection program has been run on this file and that no virus was detected.  The virus detection program utilized was Microsoft Intune Endpoint Protection, version 4.8.204.0.

## CERTIFICAT OF BAR MEMBERSHIP

I certify, pursuant to Third Circuit Local Rule 28.3(d), that I was admitted to the Bar of the United States Court of Appeals for the Third Circuit on February 4, 2010, and remain a member in good standing of the Bar of this Court.


Dated: August 24, 2015                    By: /s/ Joseph Darrell Palmer_____
                                              Joseph Darrell Palmer

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

I further certify that all parties in this case who are registered CM/ECF users that service will be accomplished by the appellate CM/ECF system.

_/s/ Joseph Darrell Palmer_____
Joseph Darrell Palmer