UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
NOS. 15-2206/2217/2230/2234/2272/2273/
2290/2291/2292/2294/2304/2305

IN RE:  NATIONAL FOOTBALL LEAGUE
PLAYERS CONCUSSION INJURY LITIGATION
        Craig Heimburger; Dawn Heimburger,
                Appellants in 15-2206
                ____

IN RE:  NATIONAL FOOTBALL LEAGUE
PLAYERS CONCUSSION INJURY LITIGATION
        Cleo Miller; Judson Flint; Elmer Underwood;
        Vincent Clark, Sr.; Ken Jones; Fred Smerlas;
        Jim Rourke; Lou Piccone;
        James David Wilkins, II,
                Appellants in 15-2217
        *Robert Jackson dismissed per Clerk's
        Order of 10/21/15

(Caption Continues)

                Transcript from the audio recording of

the oral argument held Thursday, November 19, 2015

at the United States Courthouse, 601 Market Street,

Philadelphia, Pennsylvania.  This transcript was

produced by James DeCrescenzo, a Fellow of the

Academy of Professional Reporters, a Registered

Diplomate Reporter, an Approved Reporter of the

United States District Court.

BEFORE:

        THE HONORABLE THOMAS L. AMBRO

        THE HONORABLE THOMAS M. HARDIMAN

        THE HONORABLE RICHARD L. NYGAARD

```
1    (Caption Continues:)

2    IN RE:  NATIONAL FOOTBALL LEAGUE
     PLAYERS CONCUSSION INJURY LITIGATION
3        Curtis L. Anderson,
                  Appellant in 15-2230
4                       ____

5    IN RE:  NATIONAL FOOTBALL LEAGUE
     PLAYERS CONCUSSION INJURY LITIGATION
6        Darren R. Carrington,
                  Appellant in 15-2234
7                       ____

8    IN RE:  NATIONAL FOOTBALL LEAGUE
     PLAYERS CONCUSSION INJURY LITIGATION
9        Raymond Armstrong; et al.,
                  Appellants in 15-2272
10                      ____

11   IN RE:  NATIONAL FOOTBALL LEAGUE
     PLAYERS CONCUSSION INJURY LITIGATION
12       Liyongo Patrise Alexander; et al.,
                  Appellants in 15-2273
13                      ____

14   IN RE:  NATIONAL FOOTBALL LEAGUE
     PLAYERS CONCUSSION INJURY LITIGATION
15       Scott Gilchrist, individually and on behalf of
         the Estate of Carlton Chester "Cookie"
16       Gilchrist,
                  Appellant in 15-2290
17                      ____

18   IN RE:  NATIONAL FOOTBALL LEAGUE
     PLAYERS CONCUSSION INJURY LITIGATION
19       Jimmie H. Jones; Ricky Ray; Jesse Solomon,
                  Appellants in 15-2291
20                      ____

21   (Caption Continues)

22

23

24
```

1    (Caption Continued:)

2    IN RE:   NATIONAL FOOTBALL LEAGUE
     PLAYERS CONCUSSION INJURY LITIGATION
3         Andrew Stewart,
                    Appellant in 15-2292
4                        ____

5    IN RE:   NATIONAL FOOTBALL LEAGUE
     PLAYERS CONCUSSION INJURY LITIGATION
6         Willie T. Taylor,
                    Appellant in 15-2294
7                        ____

8    IN RE:   NATIONAL FOOTBALL LEAGUE
     PLAYERS CONCUSSION INJURY LITIGATION
9         Alan Faneca; Roderick "Rock" Cartwright;
          Jeff Rohrer; Sean Considine;
10                  Appellants in 15-2304
                         ____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   APPEARANCES:

 2   STEVEN F. MOLO, ESQUIRE
     smolo@mololamken.com
 3   MOLOLAMKEN
     540 Madison Avenue
 4   New York, New York 10022
     212.607.8160
 5       Counsel for Appellant Faneca

 6
     DEEPAK GUPTA, ESQUIRE
 7   deepak@guptawessler.com
     GUPTA WESSLER
 8   1735 20th Street, N.W.
     Washington, D.C. 20009
 9   202.888.1741
         Counsel for Appellant Armstrong
10

11   HOWARD J. BASHMAN, ESQUIRE
     hjb@hjbashman.com
12   HOWARD J. BASHMAN, ESQUIRE
     Suite G-22
13   2300 Computer Avenue
     Willow Grove, Pennsylvania 19090
14   215.830.1458
         Counsel for Appellant Heimburger
15

16   CULLIN A. O'BRIEN, ESQUIRE
     cullin@cullinobrienlaw.com
17   CULLIN A. O'BRIEN, ESQUIRE
     6541 Northeast 21st Way
18   Fort Lauderdale, Florida 33308
     561.676.6370
19       Counsel for Appellant Gilchrist/Daubert

20
     CHARLES L. BECKER, ESQUIRE
21   charles.becker@klinespecter.com
     KLINE & SPECTER
22   1525 Locust Street
     19th Floor
23   Philadelphia, Pennsylvania 19102
     215.772.1394
24       Counsel for Appellants Alexander/Girsh Factors
```

1    APPEARANCES (Continued:)

2    SAMUEL ISSACHAROFF, ESQUIRE
     si13@nyu.edu
3    NEW YORK UNIVERSITY LAW SCHOOL
     Room 411J
4    40 Washington Square South
     New York, New York 10012
5    212.998.6580
          Counsel for Appellees Kevin Turner;
6          Shawn Wooden

7

     PAUL D. CLEMENT, ESQUIRE
8    pclement@bancroftpllc.com
     BANCROFT PLLC
9    500 New Jersey Avenue, N.W.
     Seventh Floor
10   Washington, D.C. 20001
     202.234.0090
11         Counsel for Appellees NFL; NFL Properties

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              THE COURT:  Good morning.  We have

 2   three cases this morning and then after the first

 3   case we will take probably a ten minute break.  The

 4   first case will probably go on for a while.

 5              The first case is In Re:  National

 6   Football League Players Concussion Injury

 7   Litigation, numbers 15-2206, et al.  And we'll

 8   start with I guess Mr. Molo.

 9              MR. MOLO:  Good morning, and may it

10   please the Court, it's a pleasure to be back here

11   on this case again.

12              We were here a little bit, almost two

13   years ago I guess now it was, and at that point in

14   time the court told us to go back to the district

15   court.  And we did.  And went through a fairness

16   hearing with Judge Brody and reached a settlement

17   that in many respects was quite good.

18              It delivers a lot of great value to

19   the class.  However --

20              THE COURT:  You're going to be dealing

21   with CTE and what other issues?

22              MR. MOLO:  I'm going to deal with the

23   issue of CTE specifically, how the settlement is

24   unfair based on its treatment of CTE and how that
```

```
 1    unfairness arose.

 2              I want to address three issues, Judge

 3    Ambro.

 4              THE COURT:  Okay.

 5              MR. MOLO:  I want to address the

 6    problem with CTE in the settlement.

 7              THE COURT:  Okay.

 8              MR. MOLO:  I want to address some of

 9    the structural defects that caused it, and then

10    what can be done to cure it.

11              THE COURT:  Okay.

12              MR. MOLO:  And I plan to do that in 10

13    minutes and 33 seconds.  I am reserving two minutes

14    of time for rebuttal, if the court doesn't mind.

15              THE COURT:  That's fine.

16              MR. MOLO:  I would appreciate doing

17    rebuttal last, given the fact that I'm arguing

18    first and we were the lead objector in the district

19    court.

20              THE COURT:  Is there anyone besides

21    yourself that you anticipate having -- taking time

22    for rebuttal?

23              MR. MOLO:  Two minutes for rebuttal.

24              THE COURT:  No, I mean is there
```

```
1   anybody besides yourself?

2              MR. MOLO:  I believe Mr. Gupta is

3   going to too.

4              THE COURT:  That's fine.

5              MR. MOLO:  The basic problem with the

6   way the settlement treats CTE, it's laid out quite

7   clearly in the papers and it's been in dispute

8   throughout the district court and throughout the

9   papers in this court, is that you can die with CTE

10  the day before the final settlement approval and be

11  awarded up to $4 million, and die the day after and

12  get nothing.

13             And that is a problem under both

14  23(a)(4) and 23(e)(2) and requires reversal.

15             THE COURT:  If that's a bad date to

16  draw a line, what date do you propose?

17             MR. MOLO:  What date I propose?  There

18  can be different treatment of CTE following the

19  final approval date, but not such a drastic

20  difference, where you can get up to $4 million

21  prior to final approval and nothing after, Judge

22  Hardiman.

23             The reason for that is that we look --

24  the ultimate question here, we can talk about
```

1    structural protections, we can talk about whether

2    or not there ought to be a CTE subclass, whether

3    there ought to be additional counsel for people

4    advocating CTE.

5              The bottom line is all of that is only

6    there to assure that what is there at the end of

7    the day in the settlement is fair, and that absent

8    class members' rights are adequately being

9    protected.  So --

10              THE COURT:  So what date do you

11    propose?

12              MR. MOLO:  I'm sorry?

13              THE COURT:  What date do you propose?

14              MR. MOLO:  I would allow the

15    settlement date to remain as it is.  However, I

16    would provide, and I would advocate that Judge

17    Brody provide, some form of relief for future

18    claimants of CTE after the final approval date.

19              It doesn't have to be $4 million.

20    There's a lot of meaningful relief that future

21    claimants for CTE can get without having to be paid

22    $4 million.

23              THE COURT:  And what do you suggest?

24              MR. MOLO:  I'm sorry?

1          THE COURT:  What do you suggest?

2          MR. MOLO:  Well, there's a number

3   of things that can happen.  One would be the

4   creation -- first of all, there could be -- back

5   end opt out rights would be one possibility.

6          As the science develops people might

7   have the opportunity to opt out later.  There could

8   be the opportunity --

9          THE COURT:  It might be that that's

10  getting two bites at the apple.  You could opt out

11  now if you want.

12         MR. MOLO:  Two bites at the apple but

13  only in the context of the situation that we have

14  here, where we're trying to reach a fair settlement

15  where -- and by the way, we are very much in favor

16  of a settlement, and a settlement as quickly as we

17  can get it to this class, which is seriously

18  injured.

19         So that second bite at the apple --

20  the only reason they're not getting that first

21  bite, if you buy the arguments of the NFL and the

22  settling plaintiffs, is that there's some ambiguity

23  that there's not a precise diagnosis of CTE right

24  now in the living.

1          The diagnosis, make no mistake, the

2    diagnosis for CTE right now postmortem is the same

3    pre-final settlement date and post-final settlement

4    date.

5          There's absolutely no difference

6    there.  They can diagnose CTE with the exact same

7    amount of certainty today.

8          So the question is what do you do

9    though for these future claimants?

10          And I think one thing that can happen

11    is there can be a fund established for people that

12    can provide them with some level of care, of

13    education, some basic therapies.

14          Like cognitive behavioral therapy has

15    been shown to benefit people with CTE.  There are

16    certain types of drug therapies that can occur at a

17    relatively low cost.

18          THE COURT:  But while they're living

19    we can't know that they have CTE, is that not the

20    case?

21    A.    At least at this point in time.

22          MR. MOLO:  Well, first of all, there's

23    a dispute over that.

24          But what is undisputed, because we

1    provided 11 affidavits in the district court from

2    the leading experts in the world that said within

3    five years we should have a definitive diagnosis.

4              And there are those who would say that

5    there are definitive diagnoses now.

6              But let's assume that there aren't.

7    Let's assume that there is at least some ambiguity.

8              THE COURT:  The best I saw was within

9    five to ten years is a good possibility that within

10   the living you can diagnose CTE.

11             MR. MOLO:  Correct.  And I think it's

12   a little bit stronger than a good possibility,

13   Judge Ambro.  I think it's a strong likelihood.

14             But be that as it may, the point is a

15   settlement like this, where there is this future

16   claims issue, should account for the evolution of

17   science.  I mean that's what Amchem/Ortiz teaches,

18   that we should at least be able to account for

19   that.  And here this settlement doesn't.

20             It's got this very mushy provision

21   that says the parties shall go back, you know.  But

22   the NFL has ultimately the discretion not to engage

23   in any kind of settlement and at the end of the

24   day -- or any kind of modification, and at the end

1    of the day --

2              THE COURT:  Well, that's subject to

3    district court oversight, is it not?

4              MR. MOLO:  It is, but it's a pretty

5    onerous --

6              THE COURT:  And if the district court

7    doesn't oversee that properly you can be right back

8    here.

9              MR. MOLO:  We could.  But I think the

10   better solution would be to find a meaningful way

11   for these people to get relief right now, because

12   it is ultimately a veto right that the NFL has at

13   the end of the day.

14             And in actuality, I mean the way that

15   that's going to play out is going to be subject to

16   a lot of process, a lot of back and forth.  Just as

17   it has been up until now.

18             What we want are some kind of rights;

19   some kind of compensation for these claims which is

20   meaningful, and right now there is no meaningful

21   compensation.  The case law --

22             THE COURT:  How can we accept that

23   premise when such a small percentage of the class

24   has either opted out or objected?  Doesn't that

```
 1   suggest that this is meaningful relief to 98

 2   percent of the class?

 3             MR. MOLO:  Well, no, I respectfully

 4   disagree, Judge Hardiman.

 5             I think the case law is pretty clear

 6   that even one objector, if raising an issue about a

 7   fundamental fairness, unfairness to the class or a

 8   violation of Rule 23 in some other respect, is

 9   enough.

10             And we've certainly done that and

11   we've done it in a very meaningful way.

12             THE COURT:  Well, that's a different

13   issue.  That doesn't mean -- that's a procedural

14   objection, right?

15             MR. MOLO:  No.  I disagree.

16             THE COURT:  That doesn't go to the

17   substance, the meaningfulness of the substance of

18   the settlement, does it?

19             MR. MOLO:  To say that a group of

20   football players who, in this instance, most of

21   them are truly -- there's a huge percentage of the

22   class that's wounded.  I mean they are having

23   difficulty with issues that are cognitive issues.

24   In many instances unfortunately, not all the class
```

1    but a certain percentage of the class are not

2    people that are the most educated people, who have

3    suffered financial reversals in their lives after

4    they stopped playing football, they've got other

5    issues.

6              The record below has evidence of that.

7    And they're not in a position necessarily to make

8    the right decision.

9              It's the district court, right, acting

10   as the fiduciary for the class and class counsel

11   that are to do that.

12             And one of the problems that we had

13   here was that the named representative for the

14   future claimants, Shawn Wooden, doesn't allege that

15   he's at risk of CTE.

16             Now, he does, as Judge Brody pointed

17   out, allege that -- he pled latent brain injuries

18   and he pled that he was at risk of developing

19   neuromuscular and neurocognitive diseases

20   associated with mild traumatic brain injury such as

21   dementia, Parkinson's, ALS and Alzheimer's.

22             Now he doesn't mention CTE, that's not

23   in the complaint.

24             THE COURT:  Wait.  Wait.  But you have

1    a logic problem.  If you can't diagnose, at least

2    as of today, CTE until you're dead, how can

3    somebody who's alive say I necessarily have CTE?

4            MR. MOLO:  He's not saying I have it.

5    He said he's at risk of getting it.  He's at risk

6    of getting it.  And we know that we can diagnose

7    whether or not he has it --

8            THE COURT:  Isn't he at risk of

9    getting it?

10           MR. MOLO:  He may be at risk of

11   getting it.  I think he probably was at risk of

12   getting it.  Judge Brody asked --

13           THE COURT:  And so is the objection

14   purely procedural?

15           MR. MOLO:  I'm sorry?

16           THE COURT:  Isn't the objection purely

17   procedural?

18           MR. MOLO:  Our objection is not

19   procedural because -- it's substantive.  Because we

20   then raised this very issue with Wooden and his

21   lawyer in pleadings and other papers that we filed

22   in the district court eight times between the

23   filing of the complaint and the filing of his

24   affidavit in support of final approval of the

1   settlement.

2            At no point in time did Wooden ever

3   change that allegation and say that he was at risk

4   of CTE.

5            He also had a lawyer who was

6   conflicted in the process in that he represented

7   some class members that had current claims as well

8   as being the lawyer for the class rep for future

9   claims.

10           THE COURT:  Isn't CTE a form of latent

11  brain injury?

12           MR. MOLO:  CTE is a form of latent

13  brain injury, but it is also an injury that is

14  specifically unique from dementia, Parkinson's,

15  ALS, Alzheimer's.

16           There could be comorbidity, but it

17  is a unique disease.  And it happens to be, by

18  the way, the only disease, the only condition that

19  is -- occurs as a result of mild traumatic brain

20  injury.

21           Parkinson's, ALS, Alzheimer's,

22  dementia, all occur in the general population and

23  don't require mild traumatic brain injury.  CTE

24  does.  And CTE was the center piece of this

1    complaint.

2              When the case began and Wooden --

3    which is why this conflict is fundamental, this is

4    not line drawing as the NFL -- my friend, the

5    professor, would say that this is just merely line

6    drawing.

7              It's not line drawing.  It is a

8    fundamental issue in the case.  It is mentioned 14

9    times in the complaint.

10             The next-most-mentioned disease is

11   mentioned eight times.  It is --

12             THE COURT:  The district court I think

13   dealt with that.  But it sounds like you're saying

14   that the illnesses that Wooden claims he's at risk

15   of are not proper proxies for CTE.  Is that what

16   you're saying?

17             MR. MOLO:  They're clearly not proper

18   proxies for CTE.  The argument is made --

19             THE COURT:  So therefore we can't put

20   any stock in the awards that are given for

21   Parkinson's and dementia and Alzheimer's.

22             MR. MOLO:  Not as credit for CTE.  The

23   one that they argue --

24             THE COURT:  Then how -- then how is

```
 1    CTE to be dealt with in light of the fact that it's
 2    diagnosed in the deceased?
 3                MR. MOLO:  You can carve it out from
 4    the release.
 5                THE COURT:  But what symptoms?  Are
 6    there other symptoms or other illnesses that could
 7    be served --
 8                MR. MOLO:  We set forth in our
 9    brief -- no, it's not a question of other
10    illnesses.  There are symptoms.  And in our brief
11    we set forth, there are four stages of CTE.
12                Significantly, some of the most
13    significant symptoms, one that appears in all four
14    stages is suicidality.  And we have the cases of
15    Junior Seau, Dave Duerson, people who in many
16    respects did not exhibit other symptoms.
17                THE COURT:  Isn't that even more
18    overinclusive than Parkinson's, dementia and
19    Alzheimer's insofar as there are many, many people
20    that experience suicidal ideation who have never
21    touched a football?
22                MR. MOLO:  There are.  But there are
23    also people that have Parkinson's, ALS and
24    Alzheimer's that never touched a football.
```

1           And to the extent -- again, we're not

2   talking about, by the way, necessarily giving

3   everybody $4 million.

4           We're talking about finding some form

5   of treatment, some form of compensation -- frankly,

6   that's really what we're talking about -- in

7   exchange for the claims.

8           The case law is pretty clear that

9   these claims need to be colorable, they need to be

10  colorable.  They need not be something that's going

11  to survive summary judgment.

12          They don't even need to be something

13  that is going to get through some type of extensive

14  discovery.  They need to be colorable.

15          And the reason that they're colorable

16  here is because they were at the centerpiece of the

17  complaint.  And the NFL -- the NFL has said as much

18  by insisting that they be included in the release.

19          If these claims were really worth

20  nothing then we wouldn't have to have them in the

21  release, we wouldn't have to have the provision

22  that that is the one disease that's not going to be

23  addressed on these look backs that occur sometime

24  after -- afterwards.

```
 1              And it renders this settlement unfair,

 2    just on the distribution terms.

 3              Forget about whether or not there

 4    ought to be independent counsel appointed or not,

 5    but just on the distribution terms and what

 6    happened in the negotiation, but just on the

 7    distribution terms it is unfair and it should go

 8    back to the district court for that reason.

 9              Now, I want to note one thing, Judge

10    Brody --

11              THE COURT:  One thing on the fairness.

12    We apply a presumption of fairness, do we not, in

13    reviewing a class settlement --

14              MR. MOLO:  Yes.

15              THE COURT:  -- where you have arm's

16    length negotiations, sufficient discovery,

17    proponents are experienced, everyone here is

18    clearly very experienced in similar litigation, and

19    only a small fraction of the class objects.

20              So there's this presumption.  So how

21    do you overcome that presumption?

22              MR. MOLO:  I think that, again, at the

23    end of the day, it's sort of solving for -- where

24    all of those things fall, what the Girsh factors
```

1    stand for, what the whole adequacy requirement

2    stands for, is that absent class members are going

3    to be treated fairly, their rights are going to be

4    protected.

5                And they weren't protected in the

6    settlement.

7                GM Trucks says first thing you do,

8    look at the distribution terms.  In a situation

9    where some part of the class gets significant

10   relief and another part of the class gets no relief

11   or very little relief, there's a problem.

12               And here there's a problem because

13   of -- I mean there was no discovery, for example.

14   I'm not saying, by the way, that --

15               THE COURT:  There was a lot of

16   informal discovery here.

17               MR. MOLO:  There was informal exchange

18   of information but no one was deposed.

19               I think that were that to happen, by

20   the way, the fraud allegations here, which are the

21   core of this case, the fraud allegations, that the

22   NFL lied to these players about the risk.

23               It's not a question of whether or not

24   there was a risk of head injury or brain injury as

1  a result of playing football.

2              The risk was concealed from them that

3  if they went back into the game sooner, or that

4  multiple concussions would cause the problems that

5  they did, and they sponsored junk science.

6              But I think discovery would do that.

7  I'm not advocating that we go back for that kind of

8  discovery.

9              Judge Brody dealt with an issue.  When

10  we were before this court the last time -- I should

11  say trying to get before this court the last time,

12  to be more precise -- we raised three issues.  We

13  raised these principle conflicts.

14              We raised the CTE issue, we raised the

15  75 percent reduction issue which we're raising

16  again as well.  And the third issue we raised was

17  the fact that the settlement excluded time for

18  people who played in NFL Europe.

19              And Judge Brody, following the

20  fairness hearing, issued an opinion in which she

21  said to the parties, you know, I kind of think the

22  settlement would be a little bit more fair if we

23  addressed this issue, and she addressed it.

24              And that was a fundamental conflict

 1    and one that brought a lot of relief, probably

 2    brought another 2,000, over 2,000 players into the

 3    settlement.  And it can be done.

 4              I think she's demonstrated a great

 5    ability to work with the parties and find a

 6    solution.

 7              I think what has to happen is the case

 8    needs to go back to Judge Brody and say

 9    notwithstanding everything you've done,

10    notwithstanding all the great work that's occurred

11    in this case, a solution needs to be found for the

12    CTE issue.

13              Now, we've advocated for that

14    throughout.

15              THE COURT:  Not the deceased, only the

16    living.  You're okay with the compensation for the

17    deceased?

18              MR. MOLO:  The compensation for the

19    deceased is fine.  We're not arguing --

20              THE COURT:  Okay.  So she's got to

21    compensate those living with CTE.  And the way that

22    will be diagnosed is if they die?

23              MR. MOLO:  Well, it could be -- it

24    could be one way.

```
 1                But what she's got to do is provide --

 2    or what the settlement has to do, more precisely,

 3    it's got to provide meaningful compensation in

 4    exchange for the release of the claims.

 5                Now, if they want to carve out the CTE

 6    claims, I guess that could make the settlement

 7    certainly more fair.  We still have this one other

 8    issue.  But we don't want that.  We want to see if

 9    we can get compensation.

10                THE COURT:  Keeping in mind that you

11    could opt out beforehand.  You could have opted out

12    beforehand, right?

13                MR. MOLO:  We could have opted out.

14    But opting out is not the answer.  And that's not

15    the right choice.  The choice isn't either look

16    at -- accept an unfair settlement that violates

17    Rule 23 and due process or opt out.

18                The settlement is -- the option is to

19    have a settlement that comports with due process,

20    comports with Rule 23, and then either accept it or

21    opt out and pursue your own thing.

22                THE COURT:  What did Judge Brody say

23    on Pages 78 through 90 of her opinion that was off

24    the mark with regard to why she wasn't at this time
```

```
 1    dealing with CTE?

 2              MR. MOLO:  In terms of the science?

 3              THE COURT:  In other words, she gave

 4    you 12, 13 pages of analysis as to why she

 5    disagrees with the points you're making today.

 6              MR. MOLO:  So what Judge Brody got

 7    wrong was the adequacy of representation.  She got

 8    wrong the -- which is really -- and the absence of

 9    a conflict of interest, those are the two

10    fundamental points here from a purely class

11    analysis.

12              THE COURT:  We dealt with the adequacy

13    of representation, at least so far.  We said that

14    latent brain injuries could include CTE.

15              MR. MOLO:  But he doesn't allege that

16    he -- it doesn't say including CTE.  In fact it

17    says just the opposite.

18              It says dementia, Parkinson's, ALS,

19    Alzheimer's, and leaves out CTE.  It's called to

20    his attention eight times and he doesn't include

21    it.

22              THE COURT:  The biggest point -- and

23    it takes a long time to get scientific evidence.

24              For example, Alzheimer's, she notes in
```

 1    footnote 53, I believe, there were some false

 2    starts there with regard to what people perceived,

 3    the medical community perceived led to Alzheimer's.

 4              CTE has really been before us for

 5    what, since '06 in terms of --

 6              MR. MOLO:  Yes, arguably.  And

 7    obviously it goes back much further if you look at

 8    the -- called dementia pugilistica, it's the punch

 9    drunk fighter syndrome and all of that.

10              THE COURT:  Punch drunk, yes.

11              MR. MOLO:  But here's the problem,

12    okay?  We can account for that.  We can account for

13    the development of science.  The problem is the

14    release.

15              We can debate how quickly we will have

16    a definitive diagnosis.  We can debate what is a

17    definitive diagnosis.  We can debate how you should

18    compensate someone with a definitive diagnosis.

19              But what we can't debate is that you

20    have -- you have no -- they have no right to demand

21    or to receive through this settlement a release of

22    a claim that is, at a minimum, is colorable based

23    on the evidence that was before the district court,

24    and by the admissions of the parties in the way

1    that they structured the settlement.

2              If this CTE claim is valueless because

3    science is too ambiguous at this point in time,

4    fine, cut it out.  Carve it out of the release.

5    Don't put the release for CTE claims in the

6    settlement.  But instead it's there.

7              So that's the tradeoff.  The tradeoff

8    here is here's a claim, and again we can debate

9    what the value of that is.  But the question is, is

10   it colorable?  The answer is, it is.

11             And for that reason this settlement is

12   unfair based on the distribution terms, based on

13   the adequacy of the representative and his counsel,

14   and it ought to go back to Judge Brody for more

15   work and hopefully come to something that's fair.

16             THE COURT:  A final question that I

17   have of you --

18             MR. MOLO:  Sure.

19             THE COURT:  -- is that the settlement

20   provides that at a certain interval that the

21   parties can get together and in good faith possibly

22   modify the uncapped fund here as to what it covers.

23             Does that not address your issue if,

24   for example, you say within five, six, seven years

```
 1    there is -- you can diagnose CTE in individuals who

 2    are still alive?

 3              MR. MOLO:  It doesn't as currently

 4    configured.  Something like that might, alright?

 5    But currently it leaves too much discretion to the

 6    NFL.

 7              To Judge Hardiman's point, it is

 8    monitored by the district court.  But nonetheless,

 9    I think there's too much discretion left to the

10    NFL, and it carves out CTE in a way that doesn't

11    really render it meaningful.

12              That kind of approach, Judge Ambro,

13    could be perfectly acceptable if done the right

14    way.  It's just a question of what it looks like.

15    But right now what it looks like is an unfair

16    settlement and it should be reversed.

17              THE COURT:  All right.  Thank you very

18    much.

19              MR. MOLO:  Thank you very much.

20              THE COURT:  Mr. Gupta.

21              MR. GUPTA:  Thank you.  May it please

22    the Court, my name is Deepak Gupta for the

23    Armstrong objectors.  I would like to try to

24    reserve two minutes for rebuttal.
```

```
 1              And I'm going to focus on adequacy of
 2    representation, and if I have time, the fee
 3    deferral issue.
 4              And I would like to start with a
 5    question that you asked, Judge Ambro, to my
 6    colleague, Mr. Molo, which was, is the problem here
 7    one of procedure or is it one of substance.
 8              And I think a central lesson of
 9    Georgine and of Amchem is that you can't take the
10    two in isolation.  In many ways the problem here
11    really is Georgine and Amchem revisited.
12              There, as here, there is a fundamental
13    divergence in this class, a conflict between those
14    who are presently injured and those whose concern
15    is for future injuries.
16              So you asked, Judge Ambro, what did
17    Judge Brody get wrong in that section of her
18    opinion.
19              The first thing she got wrong is at
20    joint appendix 92, where she said, quote, in this
21    case no fundamental conflicts exist.  That
22    conclusion is utterly at war with Georgine and
23    Amchem, because here --
24              THE COURT:  If subclass one is players
```

1    who are not yet diagnosed with a qualifying

2    diagnosis, and subclass two is retired players who

3    were diagnosed with a qualifying diagnosis, other

4    than a qualifying diagnosis not including CTE, what

5    else should she have done?

6              MR. GUPTA:  Okay.  So that gets to the

7    next step of the analysis, is if there's a conflict

8    how do you cure it.  But I think first what I'm

9    saying is that she was wrong to say that there was

10   no conflict.

11             There very much is a conflict between

12   future and present injury claimants.

13             THE COURT:  Well, I guess I'm asking

14   maybe two questions in one, but why is that under

15   Amchem or Ortiz, or our case, in Georgine from '96,

16   why is that a conflict that is irreconcilable at

17   this point?

18             MR. GUPTA:  Well, it's a conflict

19   under Georgine and Amchem because the interests of

20   future and present injury claimants are divergent.

21             As Justice Ginsburg said, what the

22   future injury claimants want, if they had truly

23   independent negotiation -- a truly independent

24   negotiator -- that person would negotiate for the

```
1    things Mr. Molo mentioned, back end opt out rights,

2    a deal that would keep pace with the science.

3              They would.  And their interests are

4    completely at odds with the present injury

5    claimants who want a quick payout immediately.

6              So I just don't think there's any way

7    to reconcile that holding of hers with Georgine and

8    Amchem.  So then the next step --

9              THE COURT:  And that's a tension that

10   occurs in any -- the asbestos cases, any cases

11   where there are a large futures class, right?

12             MR. GUPTA:  Right.  That's right.  And

13   that's --

14             THE COURT:  Should we not take

15   cognizance of and perhaps put some weight on the

16   fact that this is not a zero sum game, the uncapped

17   nature of this settlement?

18             Doesn't that distinguish it from some

19   of the other cases where the futures and present

20   subclasses are at war over a finite pool of funds?

21             MR. GUPTA:  It's always a zero sum

22   game, Your Honor, because the defendant always

23   makes some kind of calculus about what their

24   exposure is.
```

1          And the question is not what's the

2     size of the pie, but what are the allocative

3     judgments within that pie.

4          And there's no question, when you have

5     present injury claimants and future injury

6     claimants that there's a tension there.  It is

7     impossible to reconcile.

8          THE COURT:  How can the allocation be

9     as important as the pot?  I'd rather get 20 percent

10    of a million dollars than a hundred percent of $10,

11    right?

12         MR. GUPTA:  Well, in a case where 72

13    percent of the class is getting nothing, and that's

14    by class counsel's own estimates, you can see that

15    at joint appendix 1585, 72 percent of this class

16    gets nothing.

17         So the vast majority of the

18    compensation goes to people who are present injury

19    claimants.

20         THE COURT:  If 72 percent of the class

21    is getting nothing, that means 72 percent of the

22    class is not yet diagnosed with a qualifying

23    diagnosis, correct?

24         MR. GUPTA:  That's exactly right, Your

1    Honor, and the problem --

2              THE COURT:  Which is actually

3    something probably good for the NFL, that you got

4    72 percent of the people who play, even those who

5    play for a long time may not have a qualifying

6    diagnosis.

7              MR. GUPTA:  But the problem is that

8    the qualifying diagnosis framework, right, excludes

9    the telltale signs of CTE; it excludes the mood

10   disorders; it excludes the depression; it excludes

11   the stuff of CTE.

12             And instead on that grid are

13   conditions like ALS.

14             ALS is a condition that they estimate

15   only about 30 people have.  But coincidentally, or

16   not so coincidentally, the present injury subclass

17   representative is among those people.  He's at the

18   top of the grid.

19             So the problem here is that that

20   qualifying diagnosis framework was arrived at

21   before the mechanism was put in place that's

22   supposed to paper over the conflict.

23             THE COURT:  So what other qualifying

24   diagnoses should be included, apart from CTE?

 1                   MR. GUPTA:  Well, I think -- my point

 2     is not a free-standing fairness attack on the

 3     settlement, right?  What I'm showing is that you

 4     have to consider procedure.

 5                   THE COURT:  You just argued, unless I

 6     misheard you, that the scope of the qualifying

 7     diagnoses is inadequate.  And then you mentioned

 8     CTE, and we're all well aware of the controversy

 9     regarding CTE.

10                   MR. GUPTA:  Right.

11                   THE COURT:  I'm asking is there

12     anything else besides CTE which should be a

13     qualifying diagnosis?

14                   MR. GUPTA:  My point, Judge Hardiman,

15     is that if there were truly independent

16     representatives for the future injury CTE, people

17     concerned about the risk of CTE, I think they would

18     negotiate for compensation for the conditions that

19     are associated uniquely with CTE, like depression,

20     like mood disorders.

21                   Those things aren't on the grid.

22     And strangely, even though this litigation was

23     brought --

24                   THE COURT:  As Judge Hardiman noted

1   and as Judge Brody noted, depressions and mood

2   issues affect the whole population, football

3   players, nonfootball players.

4           MR. GUPTA:  Well, they are of higher

5   prevalence in the population.

6           But that doesn't mean that you settle

7   a case about CTE and end up with a settlement that

8   by the settling parties' own admission doesn't

9   compensate for CTE.  It omits CTE.

10          THE COURT:  So now the settlement's

11  going to be watered down by every field goal kicker

12  who's depressed is going to be part of the

13  settlement now?

14          Isn't that going to do great harm to

15  the folks that are part of the class that have

16  really awful brain injuries?

17          MR. GUPTA:  I don't know what's going

18  to happen, Judge Hardiman.

19          What I'm suggesting is that you have

20  to -- to comply with Georgine and Amchem you've got

21  to have a negotiation structure that provides for

22  some independent representation for those future

23  injury claimants, and that didn't happen here.

24          The subclass structure was devised

 1    after the qualifying diagnoses.

 2            THE COURT:  Judge Hardiman, by the

 3    way, you sound like Bill Parcells with regard to

 4    field goal kickers.

 5    A.    I have nothing against them.  I kicked a

 6    little myself.

 7            THE COURT:  One time there was a field

 8    goal kicker, they were asking about an injury

 9    problem with a field goal kicker and he says, "You

10    know, there's 1586 players in the NFL.  Who cares

11    about a kicker?"

12            MR. GUPTA:  Right.  I mean if it were

13    an offensive lineman though --

14            THE COURT:  But we should.

15            MR. GUPTA:  That's really the problem,

16    right?  There are people who played for many

17    seasons.

18            THE COURT:  So then we have different

19    classes then, the offensive linemen that are 12

20    year veterans, 12 year starters, if they're

21    depressed they're part of the class, but the guy

22    that only played a short time or was a bench player

23    or a kicker or a punter, they're not part of the

24    class?  How do you do that?

1                MR. GUPTA:  That's not what I'm

2    suggesting.  If you take a look at the Public

3    Citizen amicus brief, they suggest -- they show how

4    the conflicts may run more rampant than the

5    conflict we've identified.

6                The conflict we're talking about is

7    just the really big conflict at the heart of this

8    class.  It's pretty hard to deny between present

9    and future injury claimants.

10               And I want to suggest a framework for

11   you in thinking about this case, because I do think

12   you really have to consider procedure and substance

13   in tandem.

14               Luckily, we're in the Third Circuit

15   and we have the best and the most thoughtful

16   opinion that's ever been written about this

17   subject, and that is Judge Becker's decision in

18   Georgine.

19               And if you take that decision and you

20   take some of what Judge Becker said in GM Trucks,

21   you have a framework.  It is not the Girsh factors,

22   it is a framework designed to look at adequacy of

23   representation.

24               So let me suggest some questions to

```
1   ask --
2                   THE COURT:  I'm still trying to figure
3   out what your Amchem problem is.  Future injury
4   plaintiffs want protection against inflation, back
5   end opt outs --
6                   MR. GUPTA:  Right.
7                   THE COURT:  -- keep pace with science,
8   and present injury plaintiffs may wish to trade
9   those away.
10                  MR. GUPTA:  Right.  Exactly.
11                  THE COURT:  Does that really occur
12  here?
13                  MR. GUPTA:  Well, the point is that
14  conflict exists within this class.  And class
15  counsel recognized it.
16                  THE COURT:  But what tells me that
17  there's a harm from that perceived conflict?
18                  MR. GUPTA:  I think there is stark
19  disparity at the heart of this settlement.  If you
20  die with CTE the day before final approval you get
21  up to $4 million.
22                  The day after final approval you die
23  with precisely the same condition, you're
24  identically situated, you get far less.
```

1          THE COURT:  Although 89 percent of

2    those at least, based on at least one affidavit,

3    are at least covered by a qualifying diagnosis,

4    correct?

5          MR. GUPTA:  There's going to be some

6    overlap.  But if you look at the average CTE

7    payment, and this is class counsel's own estimates

8    at appendix 1573, the average CTE payment is going

9    to be 1.44 million.

10          The average dementia payment is

11   190,000, by their own estimates.  So one is not a

12   proxy for the other.

13          There's a radical disparity at the

14   heart of the settlement, and it's a disparity

15   that's explained by the conflict of interest in the

16   class.  The line is precisely the same.

17          And so I'm not saying that that

18   automatically results in reversal of the

19   settlement, but it should be a red flag.

20          And then I think you can ask other

21   questions, like have major causes of actions or

22   claims been omitted from this settlement.

23          And class counsel, I think if they're

24   consistent with their brief, is going to have to

```
1   get up here and say this settlement does not

2   compensate for CTE.

3              That should be a red flag, because I

4   thought this whole litigation was about CTE in the

5   first place.

6              And then if you follow Judge Becker's

7   logic you can ask did the parties achieve

8   settlement after little or no discovery.

9              The answer is yes.  They didn't even

10  go after the memos within the NFL's headquarters

11  about what they knew and when about the risk of

12  CTE.

13             And then you can ask is the settlement

14  accompanied by the likelihood of an enormous legal

15  fee.  The answer is yes here.

16             $113 million in legal fees for a class

17  in which 72 percent of the class gets nothing, and

18  they don't even have to bother to present their fee

19  application to the court, which I've looked, I

20  cannot find a court of appeals decision anywhere

21  that permits that kind of procedure.

22             The Seventh Circuit, Judge Posner has

23  said that is an irregular --

24             THE COURT:  The 112 and a half million
```

1    is on top of the uncapped fund, correct?

2              MR. GUPTA:  That's right.  It's on top

3    of the uncapped fund but --

4              THE WITNESS:  And it's coming out of

5    the NFL's pocket.

6              MR. GUPTA:  That's right, but --

7              THE COURT:  Why doesn't that save it?

8    I agree with you it seems rather idiosyncratic, but

9    why doesn't that segregation save it?

10             MR. GUPTA:  Judge Hardiman, that's

11   exactly the logic that this court rejected in GM

12   Trucks, because I think it's bad economics.

13             Because the defendant knows they're

14   going to have to pay a chunk of change, and that's

15   all they care about.  They don't care how it's

16   allocated between attorneys' fees or between relief

17   to the class.

18             And so if you're assessing the

19   adequacy of representation and you're assessing the

20   fairness of the settlement, you've got to know how

21   much are class counsel getting and what did they do

22   to earn that money.

23             THE COURT:  So if we remand it with

24   instructions that the settlement change from 760 to

1    872, then it's okay?

2                MR. GUPTA:  No.  No, Judge Hardiman,

3    because I think the fee is an integral term of the

4    settlement.  It's what class counsel was

5    negotiating for.

6                We need to understand, to assess

7    adequacy of representation, how much time did they

8    spend on this case?  Did they have any conflicts of

9    interest that would be revealed by side deals?

10                How much are they getting in

11    contingency fees on the side for independent -- for

12    representing individual clients?  We don't know any

13    of those things because there was no fee

14    application filed.

15                And I think you should also be

16    concerned about the prospective effect.

17                If you become the first court of

18    appeals, the Third Circuit becomes the first court

19    of appeals to allow this unusual fee deferral

20    procedure, not only would you be in conflict with

21    the Seventh Circuit, but that's a green light to

22    every plaintiff's lawyer in every future

23    settlement.

24                Let's make the settlement a fait

1   accompli, there will be no scrutiny of our fees and

2   we'll file the fee application in due course at

3   some point later.

4           You also disable court scrutiny of the

5   fees, because no one's going to have an incentive

6   to object to that fee application later on after

7   the settlement is done.

8           And that means nobody is going to

9   appeal, which means this court isn't going to get a

10  crack at assessing those fees.

11          That is a class action governance

12  problem that this settlement structure invites.

13  And it's an independent basis for reversal.

14          But I think it's also not just an

15  independent basis for reversal, but it also

16  highlights the inadequacy of representation here.

17          You can't properly assess the adequacy

18  of class counsel's representation without getting

19  the crucial information that you would get in the

20  fee application.  What did they do?  We know they

21  didn't do any discovery.

22          Did they do anything other than oppose

23  a motion to dismiss and then head straight to the

24  negotiation table?  That's a red flag.

1          THE COURT:  What were they not well

2    informed about, taking the language from GM Trucks?

3    You haven't told me yet what you would want to

4    discover.  Why were they not well informed?  What

5    information were they lacking under GM Trucks?

6          MR. GUPTA:  I think at a minimum we

7    would want to know what internal memoranda did the

8    NFL have about the risks of CTE.  What did they

9    know and when did they know it.  I think those are

10   the central questions in the case.

11          And so I think at a minimum it raises

12   a red flag when you go straight to the negotiation

13   table.

14          I'm not saying that's a per se rule.

15   You can have good settlements that result with

16   informal exchange of information and no discovery.

17   I'm simply saying that's one red flag --

18          THE COURT:  It almost sounds as if

19   what you and, to some extent, Mr. Molo are arguing

20   is that perfect is the enemy of the good.

21          This was a settlement, I think

22   probably most people perceived at the outset, would

23   be very good, highly unlikely, and yet it's

24   occurred.

1                    MR. GUPTA:  Yes.

2                    THE COURT:  So that would seem to say

3    that class counsel, at the very least, has done a

4    very good job in negotiating.

5                    MR. GUPTA:  Has done a very good job?

6                    THE COURT:  Yes.

7                    MR. GUPTA:  I think the question isn't

8    whether they should be -- whether they achieved

9    something by getting a deal.

10                   The question is at whose expense.  And

11   the problem is here you have a big red line running

12   through the class between present and future injury

13   claimants.

14                   THE COURT:  Is what you're saying,

15   because we don't have the science today with regard

16   to CTE, that this settlement should just be kicked

17   back six, seven years?

18                   MR. GUPTA:  No, I'm not suggesting

19   that.  And look, I'm not going to play God here.  I

20   think part of the problem with this settlement is

21   that the class counsel played God.

22                   But Justice Ginsburg in Amchem talks

23   about this, Judge Becker talked about it in

24   Georgine.  This was like the asbestos situation.

```
 1    The science keeps on changing.

 2              And so if I were an independent

 3    representative just for the future claimants, I

 4    would take that into account.

 5              You asked, Judge Ambro, about the

 6    mechanism that this settlement has where the

 7    parties are going to meet later on and figure out

 8    how to change it.

 9              I think something like that would be a

10    good idea.  If I were negotiating for the future

11    claimants, though, I would want there to be some

12    teeth.

13              The problem with that provision is it

14    gives the NFL unilateral veto.  They can do

15    whatever they want.  If they think it's good PR --

16              THE COURT:  Although they've agreed

17    they would negotiate in good faith, and I suppose

18    you could go back into court and say they're not

19    acting in good faith, could you not?

20              MR. GUPTA:  That's not much to work

21    with, right?  As long as they sit down at the

22    table and talk to you, I think you would be able

23    to say --

24              THE COURT:  It depends what the
```

1    evidence would be.  That's the next case.

2              MR. GUPTA:  Right.  But the point is

3    it's this case, because what the Supreme Court said

4    in Amchem is that if you have truly independent

5    representation for the future claimants, they're

6    going to negotiate with that in mind.

7              Instead, you have the settlement here

8    that freezes the science in place.  And you had a

9    subclass structure that was devised after the

10   critical decisions were made about qualifying

11   diagnoses.

12             So you had a future -- the future

13   subclass counsel is utterly inadequate.

14             He's picked after the structure is

15   devised, he's picked not by the court, but he's

16   drawn from within the ranks of the conflicted

17   plaintiffs' steering committee, so he's not

18   independent of that committee; he's drawn from it;

19   he has the same incentives as the committee; he

20   reports to them; presumably can be removed by them.

21             And finally, there's the conflict of

22   interest that we've identified.  And if you look at

23   the complaints attached to our judicial notice

24   motion, the future subclass counsel actually

1    represented present injury claimants.

2                    THE COURT:  What, two of them?

3                    MR. GUPTA:  A few.  Yes.  A few

4    complaints, but the point is he had a contingency

5    interest in those representations, and in fact

6    shared a client with the present injury subclass

7    counsel.

8                    THE COURT:  And the harm that exists

9    from that conflict, purported conflict of interest,

10   is what?

11                   MR. GUPTA:  Well, I think that's what

12   these cases, Georgine and Amchem are all about.

13   You've got to have someone who's unconflicted,

14   who's truly looking out only for the best interests

15   of the future of the claimants.

16                   THE COURT:  We talked about what the

17   possible conflicts would be, that have been noted,

18   and I'm not sure that I understand how those

19   conflicts that resulted in the harms that have been

20   noted in those cases, at least here.

21                   MR. GUPTA:  Well, I think you have

22   to -- if you don't buy that there's a basic

23   disparity in the settlement then I think I'm in

24   trouble.

1           I think you have to see that there's a

2    basic disparity in the way that CTE is treated and

3    its conditions.  I hope we've shown you, at least

4    given you some reason to be concerned about that.

5           And then I think you have to look at

6    the negotiation structure.  And I think this is not

7    a negotiation structure that's -- it's not anything

8    other than a mere gesture.

9           After the deal is really hashed out,

10   the class counsel recognized that they have a

11   problem, despite what Judge Brody said that there's

12   no fundamental conflict in interest.

13          They recognized, they knew enough to

14   know that they had an Amchem problem, and they

15   devised this subclass structure after the fact.

16   But they picked people from within their own ranks,

17   within their own conflicted group, to serve in

18   those roles.

19          And that's just, if that's enough to

20   comply with Amchem and with Georgine it reduces

21   those opinions to not very much.

22          What we really need is truly

23   independent counsel.

24          And I have faith that if this court --

1    I'm sure this court is concerned what happens --

2    you have all these legal arguments, but what

3    happens if we reverse and we send this back down,

4    is this going to throw the whole thing out?

5              I'm concerned about that too.  We

6    wouldn't be up here arguing, making these arguments

7    if we thought we would just blow the whole thing

8    up.

9              THE COURT:  You just anticipated my

10   last question.

11             MR. GUPTA:  Okay.  So let me try to --

12   do you want to answer it?

13             THE COURT:  No.  You're playing

14   defense today, I'm not.

15             MR. GUPTA:  None of us can say, none

16   of us can look into the future and we don't have a

17   crystal ball.

18             Judge Becker talks about this in his

19   opinion.  I mean at a certain point you do have to

20   do the law and there has to be -- you have to have

21   a structure that complies with the law.

22             But I also think you should feel good

23   that -- and optimistic that a deal can be done.

24             If class counsel's only argument is

1    that there was independent representation here,

2    then they shouldn't have any concerns that when

3    this goes back down and it's done the right way and

4    the Ts are crossed and the Is are dotted and

5    there's a fee application and there's proper

6    independent representation, that they'll get

7    something that looks fair.

8                    And if they're so concerned that that

9    can't happen, then there's something wrong here.

10   Then that means that this deal that's before you is

11   the product of an inadequate structure.

12                    Thank you.

13                    THE COURT:  Thank you very much.

14                    Mr. Bashman.

15                    MR. BASHMAN:  Good morning, Your

16   Honors, and may it please the Court, Howard Bashman

17   representing former NFL offensive lineman Craig

18   Heimburger and his wife.

19                    THE COURT:  Welcome.

20                    MR. BASHMAN:  Before this court can

21   uphold this settlement this court must make sure

22   that the requirements of Rule 23 are satisfied.

23                    And I'm here to argue this morning

24   that the most fundamental defect that this case

1    presents is that it cannot satisfy the predominance

2    prong.

3             It's argued in class counsel's brief

4    that that's just being half-heartedly urged on this

5    court.  Well, I'm here to wholeheartedly urge that

6    on this court this morning.

7             In fact, on Page 16 of our brief we

8    cite a passage from Amchem and we argue that that

9    passage, which demonstrated why that case did not

10   satisfy the predominance prong applies equally, if

11   not more so, to this case.

12            In fact, these people were injured --

13            THE COURT:  So it doesn't meet the

14   predominance prong because?

15            MR. BASHMAN:  I was just about to

16   touch on that.

17            THE COURT:  Go ahead.

18            MR. BASHMAN:  Because these people

19   were injured in vastly different ways over vastly

20   different time periods, to different extents.

21            The claims we heard, one of my

22   co-counsel on the objector's side argue, it

23   involves principally a fraud claim.

24            And class counsel cites to the

1    Prudential case as saying, well, fraud claims can

2    be certified.  But a more recent case from this

3    court, the Malack v. BDO Seidman case that Judge

4    Smith issued for a unanimous panel in 2010,

5    recognized that in cases where reliance is

6    important, fraud class claims cannot be certified.

7               And indeed that is generally the law

8    throughout most of the circuits.

9               This is a personal injury case.  It's

10   different from asbestos, it's different from drug

11   exposure.

12              In fact, if you look at the class

13   definition, it's unclear to me even what time

14   periods are involved, because it says all retired

15   NFL players, this is a class that spans years and

16   years.

17              THE COURT:  I thought Judge Brody

18   decided or found that the class of retired players

19   was, quote, far more cohesive, close quote, than

20   the sprawling Amchem class.

21              MR. BASHMAN:  Well, the cohesion issue

22   is just one consideration in determining

23   predominance.

24              But as we heard this morning with

1    regard to the place kickers, and I guess there was

2    a place kicker who had an op-ed yesterday in The

3    Philadelphia Inquirer, those people have much

4    different concerns than my client who was an

5    offensive lineman.

6                But to just finish the point that I

7    had started into, there were evolutions in

8    technology over the period of time that's covered

9    here, there's evolutions in scientific knowledge,

10   that the manner of injury, as I said earlier, was

11   unique.  And that the NFL's representations --

12               THE COURT:  But how does that defeat

13   (b)(3)?

14               MR. BASHMAN:  I'm sorry?

15               THE COURT:  How does that defeat the

16   predominance under (b)(3)?

17               MR. BASHMAN:  Because as to each

18   individual NFL player, the extent to which these

19   supposed representations were made and his reliance

20   upon them are going to be different.  And in fact

21   the representations are not what injure the player.

22               The representations, assuming that's

23   correct, gets the player back on the field, and

24   then whatever happens after that is precisely

```
 1    what's unique.

 2              And it is what happens after that that

 3    is giving rise to these injuries, not the

 4    representations themselves.

 5              THE COURT:  But retired players, they

 6    all know they played in the NFL, they were injured

 7    in a discrete way by a single defendant, they

 8    allege, perpetrating a common scheme of alleged

 9    fraud and negligence, correct?

10              MR. BASHMAN:  Well, that -- I mean we

11    take issue with every one of those points.  I'm not

12    going to say "correct," but that is what class

13    counsel is arguing.

14              THE COURT:  That's also what the

15    district court found.

16              MR. BASHMAN:  The district court found

17    that these are all NFL players and that they were

18    injured as a result of being NFL players.  I

19    acknowledge that, yes.

20              THE COURT:  In certain ways, certain

21    qualifying diagnoses ways, one of which CTE as

22    we've been talking about for some time.  So what,

23    you're suggesting that we have a remand because 23

24    (b)(3) is not met?
```

1          MR. BASHMAN:  Well, unlike Mr. Gupta

2    who said he doesn't want to explode the settlement,

3    my clients perceive that he does better without

4    having any class action.  So my argument to you,

5    just so that there's no doubt, is that this case --

6          THE COURT:  And he did not opt out?

7          MR. BASHMAN:  Correct.  He would have

8    been worse off, he would have been marginalized if

9    he had opted out and the settlement went forward

10   instead.

11         THE COURT:  What does that mean?  What

12   do you mean marginalized?

13         MR. BASHMAN:  That the value of his --

14         THE COURT:  That he wouldn't have a

15   fair hearing in court?

16         MR. BASHMAN:  What I'm saying is the

17   value of his case is better if there's no

18   settlement than if he had opted out and the

19   settlement goes through.

20         THE COURT:  Why?  If he opts out and

21   has his day in court, the sky's the limit.  He'll

22   get whatever damages he proves up, would he not?

23         MR. BASHMAN:  The answer to that

24   question is that the number of people that were

```
 1    pursuing these cases before the class action was

 2    brought were a distinct group of folks who had

 3    counsel, and my client was one of those.

 4              And so I think that as we perceive it,

 5    as his counsel and the client himself, it's not the

 6    same, if there were individual cases being pursued

 7    even through the MDL, which of course is a way that

 8    you can coordinate pretrial proceedings --

 9              THE COURT:  That sounds like a

10    roundabout way of saying you'd be able to get a

11    much better settlement if the NFL was getting sued

12    in thousands of cases rather than having to

13    litigate a small number of cases.

14              Is that your point?

15              MR. BASHMAN:  Right.  And I don't

16    think there's anything wrong with coming in here

17    and saying that, because that's my client's

18    interest.

19              THE COURT:  Okay.  All right.

20    A.    All right.

21              MR. BASHMAN:  Thank you, Your Honors.

22              THE COURT:  Thank you very much.

23              Mr. O'Brien.

24              MR. O'BRIEN:  Good morning, Your
```

1  Honors.  Cullin O'Brien on behalf of the Gilchrist

2  estate.

3          Our brief argues that we need to put

4  the science on trial.  One of the core allegations

5  in this case is that the NFL promoted junk science.

6  And we argue that the way that the district court

7  approached the science didn't correct that problem.

8          THE COURT:  You're saying that that

9  should have been what, a Daubert hearing?

10         MR. O'BRIEN:  Many.  Yes, Your Honor.

11 We need to put the science on trial in the light.

12         The Daubert analysis under the Blood

13 Reagents case that this court handed down this year

14 says that when a plaintiff tries to prove class

15 cert elements with expert testimony and it's

16 challenged, the trial court has to find that that

17 testimony meets the rigors of Daubert.

18         We just heard Mr. Molo say, especially

19 with respect to the CTE --

20         THE COURT:  I note the district court

21 dealt with that on page what, 44 of her opinion?

22         MR. O'BRIEN:  Footnote 37.  I don't

23 have to do it because it's objectors that are

24 challenging it.  And Your Honor, I would

 1    respectfully suggest that Amchem requires

 2    differently.

 3            We had a dispute.  Mr. Molo was saying

 4    there was a dispute about CTE, whether it can be

 5    diagnosed in live people.  And there's a dispute

 6    about that.

 7            We shouldn't be using deductive logic

 8    about the science.  We should have rigorous

 9    analysis of these scientific propositions.

10            We had untested declarations.  You

11    heard we had no discovery, and we don't even know

12    what was going on in terms of how the experts were

13    helping.  And there's a lot of testimony or I

14    guess --

15            THE COURT:  What would be the primary

16    untested declaration that you would like to

17    challenge with a Daubert hearing?

18            MR. O'BRIEN:  I would say all of them.

19    I say --

20            THE COURT:  "Primary" I think asks for

21    which one is the top of your list.

22            MR. O'BRIEN:  The primary, the ones

23    that rely upon the suggestion that CTE is not

24    diagnosable in live people, as well as excluding

1   mood disorders.

2            Because the way I listened to the

3   arguments here, everything revolves around science.

4   And I think we have a meta problem.

5            We're using deductive logic about

6   science.  Is this fair?  And what about the kicker?

7   And the kicker's not hurt.

8            What mood disorders are, isn't that in

9   the general population?  Those are all science

10  questions that should not be left to deductive

11  logic.

12           We have a process for that.  It's

13  called Daubert.  The court should sit down live

14  witnesses, go through the reliability analysis.

15           We should be cross examining those

16  live witnesses, and we may not have some of these

17  problems as to whether it's fair or not.

18           If the judge makes conclusions about

19  reliability about the science, the state of the

20  science, maybe some of these fairness issues go

21  away.

22           That's the point where we would like

23  Your Honors to remand so that we have rigorous

24  analysis about the science.  And I want to stress

1    again, the reason why we have this case is because

2    there was a defect in the science.

3              We had the NFL promoting junk science.

4    And I would ask Your Honors to question whether we

5    are much better off in the settlement, looking at

6    untested declarations, no discovery, no cross

7    examination.

8              THE COURT:  So let's say we agree with

9    you.  What happens?

10             MR. O'BRIEN:  We go back down, we get

11   the types of witnesses that the objectors were

12   asking to have at the final approval hearing.

13             I would actually ask for discovery in

14   advance of an approval hearing, discovery about the

15   witnesses that the NFL and the players promoting

16   the settlement want to put on.

17             Here's our three witnesses on why mood

18   disorders are just in the general population.

19   There's not sufficient indicia of CTE.  Here's our

20   witnesses for why CTE can't be diagnosed in live

21   people.

22             We get our own witnesses and we have a

23   true battle of the experts.  And then, based on

24   that, Judge Brody can determine whether --

```
 1              THE COURT:  So if you have this true

 2    battle of the experts, what do you anticipate the

 3    outcome would be that is significantly different

 4    than what we have today?

 5              MR. O'BRIEN:  Well, you're asking me.

 6    I think we're going to find out that we can

 7    diagnose CTE in live people.

 8              And I think we're going to find out

 9    that it's reliable to say that mood disorders

10    should be compensated.  We have repetitive head

11    trauma --

12              THE COURT:  I don't know of -- what

13    evidence do you currently have that you can

14    diagnose today CTE in live people?  Dr. Stern says

15    five to ten years away.

16              I think all the other doctors I've

17    seen, at least in this record, say it's in the

18    future.  It's coming, but it's not here yet.

19              MR. O'BRIEN:  Well, I guess I got

20    trapped by that because I would say we would need

21    the science to be able to answer that question.  I

22    thought you were asking me personally.

23              That's part of the problem.  Mr. Molo,

24    in the weeks before the final approval hearing, had
```

1    a list of witnesses on this issue.  He wanted to

2    submit some witnesses on this exact issue for the

3    final approval hearing.

4                    He had two doctors.  Their names were

5    Dr. Stern and Dr. Gardy.

6                    THE COURT:  This is Robert Stern?

7                    MR. O'BRIEN:  Yes.

8                    THE COURT:  Again, he was on TV just

9    60 Minutes this Sunday saying it's about five to

10   ten years away.

11                   MR. O'BRIEN:  He's on TV, but is he on

12   the witness stand?  Do we have a record?

13                   THE COURT:  I don't think he's going

14   to say anything a whole heck of a lot different, is

15   he?

16                   MR. O'BRIEN:  I think we owe it -- I

17   think we owe it to these players whose lives are at

18   stake in this case to at least have the man sit on

19   the witness stand.

20                   THE COURT:  Okay.  Thank you very

21   much.

22                   MR. O'BRIEN:  Thank you.  I would like

23   to reserve time for rebuttal if Daubert is raised.

24                   THE COURT:  Okay.  Thank you.

```
 1                    MR. O'BRIEN:  Thank you.

 2                    THE COURT:  Mr. Becker.

 3                    You're not going to talk about

 4      Georgine, are you?

 5                    MR. BECKER:  No.  No.  But I would

 6      point out that's a wonderful portrait that happens

 7      to have been painted by Mr. Langfitt who is in the

 8      room and is one of the lawyers for class counsel.

 9                    A lot of pages have been written on --

10                    THE COURT:  The one that captures him,

11      by the way, is the one at Yale.

12                    MR. BECKER:  I'm sorry?

13                    THE COURT:  The lounge at Yale is the

14      one that captures, I think, your father the best,

15      for me.

16                    MR. BECKER:  I agree with that.  That

17      is a beautiful portrait as well.  A lot of pages

18      have been written on the Girsh factors and the

19      Prudential factors that guide an assessment of

20      whether the settlement is fair and reasonable.

21                    And at this juncture I don't think it

22      would be productive to try to review all of them.

23                    But what I would say very simply is

24      that through that entire analysis there is, I
```

 1   think, a penetrating truth that endures, which is

 2   that 72 percent of this class is going to get

 3   nothing out of this settlement, not less than you'd

 4   want, not just a little bit, but actually nothing

 5   in exchange for the release of their claims.

 6           THE COURT:  As I asked before, if 72

 7   percent so far gets nothing, that might be a good

 8   sign for those 72 percent.

 9           MR. BECKER:  Well, that would only be

10   a good sign, Judge, if it then followed that they

11   didn't have injury.

12           THE COURT:  Correct.

13           MR. BECKER:  And the problem here is

14   that, as Mr. Molo -- or maybe it was Mr. Gupta --

15           THE COURT:  And that may change over

16   time.

17   A.    And that may change.

18           MR. BECKER:  It may.

19           THE COURT:  So maybe 72 percent, five

20   years from now becomes 42 percent.  We don't know

21   what's going to happen to the folks in the ensuing

22   years, and the settlement does have a vehicle for

23   that, does it not?

24           MR. BECKER:  But a limited one and one

1    over which the NFL has a significant veto power.

2              And I recognize that there are science

3    issues, as has been discussed, there are causation

4    issues, there are legal defenses that have been

5    asserted that might result in some of these claims,

6    or many of these claims, if those defenses are

7    successful, entering into an arbitration process

8    which has its own set of issues.

9              But at the end of the day all of

10   that -- those are complicating factors and may well

11   argue in favor of people with CTE getting less.

12   But it doesn't argue in favor of them getting

13   nothing.

14             And I would point out that there is a

15   direct correlation between this substantive problem

16   and the adequacy of, the procedural adequacy issues

17   that have been identified and stressed by Mr. Molo

18   and Mr. Gupta.

19             And at the end of the day I take

20   from -- I take seriously the observation that I

21   believe was made in the class counsel brief, that a

22   good process results in -- leads to a good result.

23   Good process leads to good result.

24             Under the Girsh factors and the

1    Prudential factors we can observe that there is a

2    profound unfairness that lies at the heart of this

3    settlement.  And that unfairness is the product of

4    something deep.

5              So in that sense the Girsh factors, I

6    think, can be viewed as a kind of cross-check

7    against the adequacy issues that you have, that you

8    have read about and has been argued to you.  And at

9    the end of the day --

10             THE COURT:  Doesn't that really come

11   back to Judge Hardiman's question that if you have

12   subclass one, people not yet diagnosed, that 72

13   percent conceivably could become, in the next

14   number of years, 42 percent?

15             MR. BECKER:  Maybe.

16             THE COURT:  So isn't that a way -- a

17   fair way to deal with it?  What else would you do?

18             MR. BECKER:  Well, I would send this

19   back, and I would force the class counsel to get

20   back to work.

21             We would cure the adequacy issues, we

22   would give everybody the vitamin of independence,

23   and we would get them back in front of Judge Brody

24   and get everyone back to work and find a better --

1  a better construct.

2            THE COURT:  What would be a better

3  construct?

4            MR. BECKER:  A better construct would

5  be one, and Mr. Molo has identified some options.

6  That could be back end opt outs, it could be -- it

7  could be a more rigorous approach to developments

8  in science.

9            But there needs to be a -- there needs

10 to be an approach that provides a more sturdy

11 construct for monitoring and compensation of the

12 15,000 retirees who currently are going to get

13 nothing, by class counsel's own documentation.

14            THE COURT:  If one of 15,000 in the

15 next few years becomes diagnosed with one of the

16 qualifying diagnoses, is that person not covered?

17            MR. BECKER:  Well, that person is

18 covered by virtue of their having a qualifying

19 diagnosis.  But they're not covered by virtue of

20 their having CTE.  And if there's one thing that

21 has come out --

22            THE COURT:  And that conceivably may

23 change once the science becomes more solidified.

24            MR. BECKER:  That may change.  That

 1    may change.  But right now -- and yes, it's true

 2    that the settlement does provide for a periodic

 3    meeting, I think it's every ten years --

 4                    THE COURT:  Right.

 5                    MR. BECKER:  -- the class and the NFL

 6    would get together.  But at the end of the day the

 7    NFL holds the veto power as to what becomes a

 8    qualifying diagnosis.

 9                    That veto power is -- represents a

10    strangle hold on the ability of the 15,000 people

11    who currently will get nothing, and yet will have

12    debilitating or may have debilitating injury, from

13    receiving compensation under this class.

14                    These are all solvable problems.  And

15    what I urge and what I believe many here are urging

16    is that you send this back, get everyone back to

17    work and find a better solution for that issue.

18                    THE COURT:  All right.  Thank you very

19    much.

20                    MR. BECKER:  Thank you.

21                    THE COURT:  We'll hear from

22    Mr. Issacharoff.

23                    MR. ISSACHAROFF:  Thank you, Judge

24    Ambro.  And may it please the Court, Samuel

```
 1    Issacharoff for the class counsel and class
 2    plaintiffs.  I will be dividing --
 3                 THE COURT:  Did I once again put the
 4    emphasis on the wrong syllable?  I did it again.
 5    I'm sorry.
 6                 MR. ISSACHAROFF:  We've done this
 7    before, Judge Ambro.
 8                 THE COURT:  Yes.
 9                 MR. ISSACHAROFF:  And we'll keep
10    working at it.
11                 THE COURT:  One of these years I'll
12    get it right.
13                 MR. ISSACHAROFF:  Yes.  Thank you.  I
14    will be dividing the issues with Mr. Clement.
15                 He will be addressing primarily the
16    Girsh factors and the fairness of the settlement,
17    although I may touch on some of that, and I will be
18    addressing the challenges to the class
19    certification and the adequacy of counsel and the
20    representative parties.
21                 I want to make three basic points.
22    First, I want to discuss the settlement and what it
23    provides for the class.
24                 Second, I want to correct the record
```

1    on the question of CTE, and particularly Shawn

2    Wooden's allegations in his complaint.

3              And third, I want to address the

4    mischaracterizations of this court's history on the

5    award of attorneys' fees in ongoing complex mass

6    tort settlements.

7              So if that pleases the court I will

8    proceed in that order.

9              THE COURT:  That's fine.

10             MR. ISSACHAROFF:  There's a

11   fundamental misunderstanding about what this

12   settlement does.  This settlement is designed to do

13   two things.

14             First of all, it's designed to

15   compensate neurological and cognitive deficits

16   caused by football; and second, it's designed to

17   compensate that in the living, for people who have

18   these disorders and whose lives are compromised as

19   a result.

20             This is not a settlement that purports

21   to treat every underlying manifestation of a life

22   spent playing football, it is not a settlement

23   which purports to cover the waterfront of any

24   possible consequence that may come from that.

1          It is designed to get at those

2    diagnoses, those conditions that have been

3    established by the science of today as being

4    causally related to football.  And these are all

5    epidemiological claims.

6          These are all claims that say you have

7    a heightened risk of ALS, you have a heightened

8    risk of Parkinson's, and we will compensate you if

9    you get Parkinson's or if you get ALS, because we

10   understand that in some provable way that condition

11   may be linked to football, or at least may be

12   linked across the spectrum of people who get those

13   diseases.

14          Now, what that means is that this

15   settlement is largely an insurance policy for every

16   single class member that says if you should be

17   befallen by one of these conditions your lives will

18   be materially improved, you will get the assistance

19   needed.

20          Our lead class representative on the

21   presently diagnosed, Kevin Turner, is in desperate

22   condition with ALS.  All his life functions have

23   been compromised.

24          This settlement would put $5 million

```
 1   in his hands.  He does not have the ability to

 2   withstand the financial pressures right now of his

 3   disease.

 4              What this settlement is not designed

 5   to do is to compensate anything that might be

 6   thought to be related to NFL play.  If we did that,

 7   and we could, we could have said any NFL player --

 8              THE COURT:  It obviously doesn't

 9   relate to ACL tears.

10              MR. ISSACHAROFF:  It doesn't relate to

11   ACL tears.

12              THE COURT:  But what confidence can we

13   have, in the absence of the kind of scientific

14   testing that Mr. O'Brien was advocating for, that

15   these diagnoses, these qualifying diagnoses,

16   adequately cover the field for all of the

17   concussion-related injuries that a player might

18   have suffered?

19              MR. ISSACHAROFF:  We cannot say that

20   we will never know that something will be

21   different.  And none of us here can predict into

22   the future in that fashion.  What we can say is

23   that this is an unusual class action.

24              In fact, it's a unique class action,
```

1    because a quarter of the class had already filed

2    suit as of the time that the settlement took place.

3    And that quarter of the class was making a claim

4    for what could be proven at this moment.

5              Now, it is true that science could

6    change and there is some meet-and-confer language

7    in the settlement agreement.  But I don't want to

8    put too much weight on that.

9              Because this is a settlement that

10   offers right now the following:  We will give you

11   an immediate battery of medical tests.

12             If those medical tests show that there

13   is something that needs to be treated, we will

14   assist you with the medical care, we will assist

15   you with the pharmaceuticals that you need for

16   that.  That's here and now.

17             And we will offer you a guarantee that

18   if something comes in the future, then you will be

19   compensated for these conditions, which are the

20   most serious that are associated at this time with

21   playing football.

22             That's what the settlement is designed

23   to do.

24             Now, this court has previously

1    recognized that when there is a fundamental

2    interest in the ongoing processes, that this takes

3    away the conflict.  And I want to say there's three

4    basic reasons the conflict is taken away here.

5              First of all, as has been discussed,

6    we had subclass representatives.  But we had more

7    than subclass representatives here.

8              With 5200 people having filed suit, by

9    our analysis, 4900 of those are not symptomatic at

10   this point.  4900 out of 5200, roughly, do not have

11   a qualifying disease at this point.  They are

12   represented by 300 sets of lawyers.

13             So you had more subclass counsel, as

14   it were, more subclass representatives reviewing

15   the settlement.  And of those people, all but 80

16   chose to stay in the settlement.  All of them have

17   voted affirmatively.

18             THE COURT:  For those who opted out,

19   do you have any information about the principal

20   reasons as to why they opted out?

21             MR. ISSACHAROFF:  Yes.  It all turns

22   on their lawyers, quite frankly, Judge Ambro.  I

23   didn't want to say that.

24             THE COURT:  That's fine.

1          MR. ISSACHAROFF:  And the reason that

2   if you -- but the opt out, to go to the opt out

3   point on a legal basis, in the Diet Drugs

4   litigation -- by the way, nobody mentions, nobody

5   mentions.  It's like a one off case.

6          Forty-three times that case came

7   before this court.  Every judge on this panel has

8   sat in at least one Diet Drugs case.

9          THE COURT:  How well I know.

10          MR. ISSACHAROFF:  Yes, Judge Ambro,

11   you've set the record for Diet Drug cases.

12          But the opt out is meaningful here.

13   And that's what sets this apart from the Georgine,

14   Amchem type case.

15          In Amchem the class included everybody

16   in this room, everybody born before 1993 whose

17   parent may have been exposed in an office or

18   anyplace else to asbestos.  That's everybody.

19          I was a class member; I had no idea.

20   That's the kind of class that you were dealing with

21   in Amchem.

22          In GM Trucks this court said these are

23   people who have small coupon values, who have no

24   incentive to try to protect their claims.

1              In this case the fact that a quarter

2    of the class has opted out is an indication of the

3    unique quality of this class action.  This is the

4    most cohesive, informed class.

5              THE COURT:  You said a quarter?

6              MR. ISSACHAROFF:  Yes, a quarter of

7    the class had filed suit.  I'm sorry.

8              THE COURT:  Okay.  Only one percent I

9    think is 202, right?

10             MR. ISSACHAROFF:  I almost got fired

11   right there.  I almost lost the whole case right

12   there, Your Honor.

13             The reality is that a quarter had

14   filed suit, which meant they had made an

15   affirmative choice that the legal system, on an

16   individual or couple of cases filed together, was a

17   viable option for them.

18             That has never happened before.  We've

19   never seen that.

20             We have at this point -- this is not

21   in the record because it's an ongoing figure, but

22   7500 class members have already tried to enroll in

23   some fashion into the settlement process, even

24   though it's not open.

```
1              This is a participatory settlement of
2    a kind that we've never seen.
3              A lot of the focus in cases like
4    Amchem on the need for strict rules on subclass
5    representation and the like is because there's no
6    reason that a class member would actually protect
7    his or her rights, or his rights in this case.
8              THE COURT:  One of the questions with
9    regard to subclass counsel, I understand that they
10   were picked from the steering committee while
11   negotiations were ongoing, why not go to the
12   district court and have the -- ask the court to
13   pick someone from the outside?
14             MR. ISSACHAROFF:  Well, Your Honor, to
15   pick somebody from the outside would mean that we
16   would move outside the expertise of who the
17   district court had chosen as the plaintiffs'
18   steering committee.
19             There was an application process to be
20   part of the plaintiffs' steering committee.
21             And the district court chose the
22   people that she thought were the most capable, the
23   most informed, the most likely to prosecute this
24   case successfully.
```

```
 1                    To go outside that means to, quite

 2      frankly, water down the quality of the

 3      representation beyond what the district court had

 4      found.  And no court has ever made that --

 5                    THE COURT:  The objectors claim that

 6      Mr. Wooden doesn't adequately represent a certain

 7      group's interest because he doesn't have CTE.

 8      What's your response to that?

 9                    MR. ISSACHAROFF:  Well, because he

10      didn't allege CTE they say.

11                    THE COURT:  Right.

12                    MR. ISSACHAROFF:  That's just a flat

13      misrepresentation of the record, unfortunately.

14                    If one goes back in the record to the

15      district court complaint that Mr. Wooden filed in

16      his individual capacity in the Southern District of

17      Florida in 2012 -- 2010 I think, that complaint

18      alleges CTE 13 different times.

19                    There's an entire subsection of that

20      complaint called CTE.  One of the prayers for

21      relief in that complaint is a request for medical

22      monitoring specifically to address the problem of

23      CTE risk.

24                    In addition, in the district court,
```

1    once the cases were transferred by the MDL panel to

2    Judge Brody's court, Mr. Wooden filed a renewed

3    complaint, this time as class representative.

4                In that complaint it copies verbatim

5    what he had alleged in the Southern District of

6    Florida.

7                And so 13 times again he makes the CTE

8    allegations, and 13 times those are linked to a

9    prayer for relief for CTE monitoring.

10                THE COURT:  All right.  But I think

11    their answer, they can correct me if I'm wrong, but

12    I think their response to those facts you just

13    cited is that he's given away the farm because he's

14    not getting anything for CTE, right?

15                MR. ISSACHAROFF:  Mr. Wooden, no.  We

16    have no way of knowing whether Mr. Wooden has CTE.

17                THE COURT:  So we keep getting back to

18    this first principle of whether or not CTE can be

19    diagnosed in the living.

20                MR. ISSACHAROFF:  Yes.  And the

21    problem is --

22                THE COURT:  And why is there not a

23    factual dispute on that?

24                MR. ISSACHAROFF:  Why is there not a

1    factual dispute?  Because the medical evidence is

2    uniform on this question.

3              The scientific -- you go to any peer

4    review journal, there's nothing in the literature,

5    there's nothing in any of the experts propounded by

6    anybody in the court below, not by the NFL, not by

7    us, not by the objectors, that challenges that very

8    proposition.

9              THE COURT:  All right.  But you'd

10   concede that five years from now the inverse might

11   be true.

12             MR. ISSACHAROFF:  It might be true.

13             THE COURT:  So then what happens?

14             Let's assume that five years from now

15   all that literature flips and says you know what,

16   we can diagnose CTE in the living and there's a

17   very medically determinable test to do that, then

18   what happens to the folks that are part of the

19   class now?

20             MR. ISSACHAROFF:  If the diagnosis of

21   CTE is linked scientifically to any of the

22   qualifying diseases, then the parties will have an

23   obligation to meet and confer --

24             THE COURT:  What if it's not linked to

1    a qualifying disease but it's directly tied to

2    repeated blows to the head that are found commonly

3    in NFL football?

4              MR. ISSACHAROFF:  Well, then we have

5    the other parts of the case that people have to

6    understand in any settlement.  Any settlement is

7    against the background of risk.

8              Every single case that had gone

9    forward, and no objector wants to talk about this,

10   every single case that had gone forward had already

11   lost on the labor preemption grounds.

12             Even if CTE is linked to football,

13   then how does that establish it's linked to NFL

14   football?  If you go to the only --

15             THE COURT:  But that's an argument to

16   have no settlement.  That's an argument on the

17   merits that you win and they're not entitled to any

18   recovery for any injury.

19             MR. ISSACHAROFF:  Well, I don't win on

20   that, my class loses entirely on that score.

21             THE COURT:  Well, I guess that's

22   Mr. Clement.

23             MR. ISSACHAROFF:  For the NFL.  But

24   that's the point, Judge Hardiman, that we would

1    lose entirely.

2              And so here's where the science is, if

3    you look at the McKee study, which is the only one

4    that has actually examined the 91 brains that have

5    been reviewed so far.

6              A quarter of them who also tested

7    positive had never played in the NFL.  Six or eight

8    of them had been high school students who had died

9    and had CTE on the brain.

10             It may very well be that early life

11   contact is what causes the CTE accumulation.  We

12   don't know.

13             It's also possible that the advance of

14   the science will be like the advance of Alzheimer's

15   as reflected in footnote 53 of the district court's

16   opinion.

17             It may turn out that the advance of

18   science shows that ALS is not related to CTE, it's

19   not related to football.

20             We could have any number of advances

21   in science.  One makes an educated guess in any

22   litigation.  If any single player of these 5200 who

23   had filed suit had gone forward in their trials,

24   any one of them would face this question.

1          And if they were offered an individual

2   settlement then they would have to address the

3   question of whether or not this was an adequate

4   settlement, given the risks and given the future

5   developments.

6          This happens in every car accident

7   case.  I'm injured today, it may turn out that my

8   back will deteriorate in five years and I have to

9   accept the settlement today or not.

10         And these settlements are not kept

11  open on the grounds that, well, there may be better

12  MRIs in five years that can detect some kind of

13  latent condition that right now hasn't manifested

14  itself.

15         THE COURT:  One of, if not -- this is

16  on the second issue you wanted to speak about, and

17  to some extent you're talking about it now, CTE.

18         You die on April 21 of this year and

19  you're diagnosed with CTE and you can get an award

20  up to 4 million.  If you die on April 23 you don't.

21         MR. ISSACHAROFF:  That's correct.

22         THE COURT:  And their argument is

23  that's unfair.  And your response to that is?

24         MR. ISSACHAROFF:  Well, there are

1    several responses.  First, there is a line-drawing

2    question, as the court indicated right at the very

3    beginning.  So some date is going to be a trigger

4    date if this structure is put in place.

5                 The main argument is that this is a

6    case about trying to compensate the living.  It's

7    trying to compensate those, while they are alive,

8    who have the disease.

9                 Now, we have a problem in the

10   settlement, which is that there is a small number

11   of people who died before the effective date of the

12   settlement, who could not get the kind of medical

13   diagnoses that are necessary and for whom we have

14   some reason to suspect that the quality of their

15   life was compromised by their exposure to football,

16   along the lines of one of the qualifying

17   conditions.

18                 So for a group of about 50 or 60

19   people a humanitarian exception was made.  And

20   that's what it was.  It was an extraordinary

21   additional benefit.  The benefits that the district

22   court found was calibrated so that they --

23                 THE COURT:  And did that cover people

24   like Mr. Mackey?  Or who did that cover, people

1  like Mr. Mackey?

2          MR. ISSACHAROFF:  Yes.  It covered

3  people who died in the period after the start date

4  of the class, which is 2007, and who died before

5  the settlement was approved, which is individuals

6  who were never on notice that they should get the

7  kind of baseline examination that the settlement

8  provides to every single class member that couldn't

9  get the treatments that the settlement will

10 facilitate for class members.

11         None of that was available to those

12 individuals.  And so we made an approximation.

13         And what the court found was that the

14 individual awards that followed from death with CTE

15 to these 50 or 60 people are roughly what they

16 likely would have gotten under the terms of the

17 settlement had they been able to prove up their

18 medical conditions.

19         But Judge Ambro, I think that the

20 critical point, which I want to stress again, is

21 that if they die after the settlement goes into

22 effect and they have none of the qualifying

23 conditions and it turns out that they have a

24 pathology that caused their brain to have this tau

1    protein, all the best to them.

2                    They lived a good life.

3                    It is also true that Alzheimer's can

4    still, to this day, only be conclusively diagnosed

5    upon death.

6                    But we have enough scientific evidence

7    to say these conditions are so correlated if found

8    in conjunction, so correlated with Alzheimer's that

9    when they exist we think that there's Alzheimer's.

10   And that's what this settlement is compensating.

11                   It turns out that if you do an autopsy

12   postmortem on somebody and you find Alzheimer's but

13   you didn't find any signs of dementia during their

14   lives, which is they had it, they were lucky, they

15   don't get compensated here either.

16                   THE COURT:  So that's in effect the

17   answer to the claim that hey, 11 percent may have

18   CTE, and 89 percent of a group of a hundred were

19   diagnosed with a qualifying diagnosis, 11 percent

20   weren't, you're saying that's good for them because

21   they didn't have the symptoms that would qualify

22   for the disease.

23                   MR. ISSACHAROFF:  It's a bizarre day

24   when I have to stand up here and say that you had

1  the malfortune of not having ALS.  This is a

2  ridiculous argument.

3         You lived your life in a healthy

4  fashion.  You didn't have dementia; you didn't have

5  Parkinson's; you didn't have ALS.  Those are the

6  conditions that are being compensated here.  And if

7  you don't get them, all to the better.

8         That was the same as the settlement

9  that this court approved --

10         THE COURT:  Well, they're saying yes,

11  but I had CTE.  And your answer is well, nobody

12  could have known that definitively because the

13  science hasn't caught up.

14         MR. ISSACHAROFF:  And even if you did,

15  if you did not have a compromise of your life

16  functions, then you don't get compensated under the

17  settlement.  This is just like --

18         THE COURT:  Because there's no

19  evidence that the buildup of the tau protein

20  compromises one's activities of daily life?

21         MR. ISSACHAROFF:  There's no

22  scientific evidence of that at all, unless it has

23  manifested in some condition that we are going to

24  compensate here.

1          Again, the district court said, and

2     none of the objectors have addressed this, that she

3     based the record here on the Diet Drugs record.

4          She tried to model this after the Diet

5     Drugs settlement.  And she approved it in light of

6     this court's repeated endorsements of Diet Drugs.

7          In Diet Drugs there was valve

8     compromise in every single person who took this

9     medication.  Some of it rose to a compensable

10    level, some of it did not.

11         Some people lived out their whole

12    lives and never had heart trouble that compromised

13    their life functions.  Some did, and they were

14    compensated, and they were compensated generously

15    under the terms of the settlement.

16         For those who had an assault upon

17    their cardiac functions as a result of the drug but

18    who nonetheless were able to live out their lives

19    in normal fashion, Godspeed.  This is a good thing.

20         But you had an insurance policy, you

21    had medical testing provided for you by the

22    settlement.

23         That's exactly what was done here, in

24    order to provide these people with a measure of

1   security.  And again, they have the ability to opt

2   out.  These are viable individual lawsuits, so they

3   claim.

4          Although oddly, Mr. Molo has no cases

5   on file.  And so that's a question of how he stands

6   up to make a demand upon the settlement when he has

7   never even initiated litigation on behalf of

8   anybody.

9          THE COURT:  I think the third point

10  you were going to address was what, the attorneys'

11  fees?

12         MR. ISSACHAROFF:  Yes.  So there's a

13  claim made now that there's fundamental legal error

14  because there was a divide between the merits

15  determination and -- on the settlement, and the

16  attorneys' fees which was subsequent.

17         Mr. Gupta gets up and says there's no

18  court case that has ever approved anything like

19  this.  That's just not true.

20         The district court said that she's

21  relying upon this court's decision in Diet Drugs in

22  2009 for exactly this kind of settlement.

23         In Diet Drugs the settlement was

24  entered into in 1999, 2000, it was approved in

1    2000; the attorneys' fees protocol was not put into

2    place until 2001; the fee awards were not made

3    until 2007.

4         This court didn't approve it until

5    2009 on the issue that nobody would ever have an

6    incentive to show up.  Mr. Bashman was before this

7    court attacking that settlement as well and

8    attacking the fees on that case.

9         In the Deep Water Horizon litigation,

10   which the court also identifies, the settlement

11   there was in 2012.  The district court has issued

12   an order saying that the fees will not begin to be

13   considered until 2016.

14        And there's a reason for this in mass

15   torts.  When you have to implement the settlement,

16   when you have to administer it, there's a huge

17   amount of work that is unanticipated.

18        It would have been absurd for the

19   district court to entertain a fee petition in 2000

20   or 2001 in the Diet Drugs litigation because we

21   know now that that case had to go through multiple

22   iterations, multiple amendments, billions of

23   dollars of additional compensation to the class,

24   all realized by class counsel and other class

1    lawyers, and that it took 43 appeals to this court

2    so far to get all the mechanics of the deal worked

3    out.

4              There have been dozens of appeals in

5    the BP litigation.  So we have the experience that

6    what we want to do is align the incentives of class

7    counsel with the incentives of the class.

8              We don't know how the class is going

9    to do yet because we don't know what work remains

10    to be had.  And the intelligent approach is to

11    sever the class recovery from the fee recovery.

12    That's Prandini.

13              THE COURT:  So if the total recovery

14    for the class ends up being 2 billion you're not

15    going to go back to court for a fee enhancement?

16              That would be a pretty small

17    contingency take if it goes up to 2 billion, but I

18    just want to make sure I understand that's a static

19    number you've got there.

20              MR. ISSACHAROFF:  If it ends up going

21    up to 2 billion under the current terms of the

22    settlement, absolutely not.  If there turn out to

23    be different settlements, for example --

24              THE COURT:  New work, yes.

```
 1              MR. ISSACHAROFF:  Well, it's not even
 2    new work, Your Honor.  We're still litigating
 3    against Riddell.  All of these plaintiffs have
 4    claims against the manufacturer of the equipment.
 5    And those claims did not settle.
 6              The PSC, the class counsel in their
 7    role as PSC is still prosecuting those claims, and
 8    there may be more money that comes from them.
 9              And then of course there will be -- I
10    can't deny that there will be a fee request at that
11    point.  But that's for additional work.
12              For this it is up to 112 million.
13    Every class member is on notice of that.  Every
14    class member knows that the lawyers are going to
15    get paid.  And if I could just make one last point
16    about adding things to the record at this point.
17              Nobody, nobody raised the 23(h)
18    argument below.  Nobody, not any of the objectors,
19    not even the amici.  Nobody raised the demand that
20    there be a full fee petition presented.
21              And so if you go through Judge Brody's
22    opinion where she meticulously analyzes every
23    single claim that is put before her, you'll notice
24    conspicuously that this one is not there.
```

1          And as this court said in Insurance

2     Brokerage it is the burden of the party that wants

3     to raise an issue on appeal to make sure that this

4     has been fully presented to the district court.

5          Nobody made these outlandish

6     allegations about Mr. Levin in the district court.

7     And I will represent to this court that what

8     Mr. Gupta said here today is just false, absolutely

9     false.

10          Mr. Levin does not represent anybody

11    who has a qualifying diagnosis today.  I don't know

12    where he's getting this from.  But the key thing is

13    nobody presented it to the district court.

14          If this had been presented to the

15    district court and if this turns out to have been a

16    fundamental conflict, which I don't believe it

17    would be under any circumstances, the district

18    court could have said, Mr. Levin, I don't think

19    you're the appropriate person to represent this

20    subclass, I'm going to substitute in somebody else.

21          But it was not raised.  And it is

22    absolutely irresponsible to raise things here and

23    then to lodge documents asking this court to

24    basically create a new record and to lodge them in

```
 1    support of a reply brief on appeal.

 2              That's just improper, improper,

 3    improper, Your Honors.  That cannot be tolerated in

 4    appellate practice.

 5              THE COURT:  Thank you very much.

 6              MR. ISSACHAROFF:  Thank you, Your

 7    Honor.

 8              THE COURT:  Mr. Clement.

 9              MR. CLEMENT:  Good morning, Your

10    Honors.  And may it please the Court, Paul Clement

11    for the NFL.

12              The settlement reached here is fair,

13    reasonable and more than adequate.  It provides

14    nearly a billion dollars in compensation to class

15    members who face serious obstacles to any judicial

16    recovery.

17              THE COURT:  At the outset there was a

18    collective bargaining agreement alleged preemption.

19    And there was a motion filed.  Why was that not

20    taken to getting the court to deal with that before

21    you entered into settlement negotiations?

22              MR. CLEMENT:  Well, the district court

23    judge heard oral argument on that motion and then

24    essentially suggested that parties, things were
```

```
 1    ripe for mediation and withheld deciding the motion

 2    in order for that mediation to run its course.

 3                   THE COURT:  Okay.

 4                   MR. CLEMENT:  And after a lot of

 5    exhaustive effort, obviously the mediation ran its

 6    course and produced this settlement.

 7                   But I think in some respects, if you

 8    listen to the objectors, they would like to talk

 9    about this entire case as if that preemption

10    defense did not exist.

11                   But if you look at the Girsh factors,

12    there's nine of them, I'm not going to march

13    through them for you here, but I'm happy to address

14    any of them.

15                   But the gist of those factors is did

16    the class get good value in this settlement

17    compared to the relevant alternative, which is

18    litigating these claims.

19                   And you can't have this discussion

20    without recognizing that there is a serious legal

21    obstacle to these claims in the form of preemption.

22    It's not the only one.

23                   I mean proving causation in a case

24    like this would be an absolute nightmare for the
```

1   class.  And they recognize that in their affidavit

2   that class counsel has filed.

3               So these are real serious obstacles to

4   pursuing these claims in court if you don't reach a

5   settlement.

6               And just one more word about the labor

7   preemption argument because I think it's quite

8   critical, is on the labor preemption argument every

9   defendant, of course, is going to think they have

10  some great legal argument in their back pocket.

11              But this isn't just your sort of run

12  of the mill argument.

13              In a number of analogous cases, we

14  collect them in our brief, but in a number of

15  analogous cases this very client, the NFL, has

16  prevailed on the labor preemption defense.

17              You have two cases, Duerson and

18  Maxwell, who are part of this case only -- they

19  were originally filed in state court.  They were

20  removed to federal court.  There was an effort to

21  get them back into state court and two different

22  trial judges in this very case said that no, they

23  have to stay in federal court under complete

24  preemption under the LMRA.

1              And there's a few differences between

2    the removal question and the preemption question as

3    a defense.  But not many.

4              So you're talking about a case where

5    there's nearly a billion dollars in value provided

6    to the class in the context of a class that very

7    well could get zero in terms of their judicial

8    recovery if they pursue the alternative to

9    settlement.

10             And so I think that's why our friends

11   on the other side, the objectors here today, do not

12   really want to spend a lot of time talking about

13   the Girsh factors, because the Girsh factors do

14   keep pointing you back to was this a good value

15   settlement.

16             One of the factors that the court, of

17   course, takes into account in doing the Girsh

18   analysis is how did the class react to this

19   settlement.

20             And I know the panel has alluded to it

21   so I won't belabor the point too much, but if less

22   than one percent objecting, less than one percent

23   opting out, and all in the context where 25 percent

24   of the class has individual counsel, which is a

1    fact that you're going to have in almost no other

2    class action.

3              So in a lot of cases you might think

4    nobody's opting out because who cares if you get a

5    settlement, a coupon in the mail, right?

6              But here these are personal injury

7    claims, they are claims that many of the class

8    members, 25 percent thought were ripe enough and

9    important enough to file an individual action, and

10   yet they've looked at this and they say given all

11   the problems that our claims would face if we

12   litigated, this is a very good deal.

13             THE COURT:  Would you address the

14   mechanisms in the settlement that might allow it to

15   keep pace with the evolving science on CTE.

16             MR. CLEMENT:  I'd be happy to, Judge,

17   and I think it's actually important because I

18   don't -- as my co-counsel alluded to, I don't want

19   you to put --

20             THE COURT:  You didn't make my mistake

21   which is try to pronounce his name.

22             MR. CLEMENT:  Exactly.  Exactly.

23   Bypass that.

24             I don't think you should put too much

1  weight on those, because what they provide is a

2  mechanism to keep pace with the science largely in

3  terms of making sure that the various qualifying

4  diagnoses, if the medicine changes on those such

5  that the way you diagnose Alzheimer's is different,

6  or the way that you -- nobody's talked about

7  dementia, but there's two qualifying diagnoses

8  about dementia.

9            If the way you diagnose those are

10  different, then that's something that the parties

11  are supposed to address and update the settlement

12  for.

13            The settlement does not really

14  contemplate the idea that if there is some new

15  disease that nobody contemplates is associated with

16  CTE or playing football for MTBI that's not really

17  something within the contemplation of the

18  settlement.

19            THE COURT:  Well, it's a little

20  broader than that, isn't it?  There are diseases we

21  know exist, depression being one of them, that

22  isn't covered.

23            But I guess your answer to that is

24  well, they weren't going to be able to prove that

```
1    in a court of law so it's reasonable to excise that
2    from the settlement.  Is that your view on that?
3                 MR. CLEMENT:  That's exactly right,
4    Your Honor.
5                 THE COURT:  Because you do concede, do
6    you not, Mr. Clement, that it's certainly possible
7    that there could be a direct link between
8    depression and repetitive concussive hits?
9                 MR. CLEMENT:  There could be, Your
10   Honor.  I don't think the current science fully
11   supports that, but there could be.
12                Of course, another thing that I think
13   is really important to keep in mind in thinking
14   about the future development of the science is
15   there's no guarantee it's going to develop in a way
16   that particularly aids the plaintiffs as opposed to
17   aiding the defendants.
18                Again, it was alluded to already, but
19   the science could determine that really all that
20   matters for developing CTE is how many hits you
21   take before your 18th birthday.
22                And if the science actually proved
23   that then my clients essentially would have a great
24   defense on causation in all of these cases, and yet
```

1    there's no back end opt out for us.

2              We're still going to be paying all the

3    class members because those are the risks that both

4    parties make when they enter a settlement like

5    that.

6              And that's not limited to class action

7    litigation, it's not -- even when you're doing a

8    regular case, an individual case, whether you

9    litigate it or you settle it, you're likely, either

10   through res judicata or the terms of your

11   settlement, to release your future claims.

12             And you go into court and you prove

13   what you can prove.

14             And another misconception I think here

15   is a lot of the objectors want to say there's no

16   compensation prospectively for CTE.

17             And of course at one level that's

18   true.  If you're sort of looking for the provision

19   that provides compensation in hæc verba it's not

20   there.

21             But what the settlement does, I think,

22   is provide compensation for CTE in exactly the way

23   that the current science allows and our litigation

24   system allows.

1          And so what you need is, you need a

2   manifestation of a serious injury.

3          And so if you look at the conditions

4   that the current science suggests are associated

5   with CTE, and we're years and years away from

6   causation, but association, what you get is things

7   like Parkinson's and Alzheimer's.

8          But what you principally get is what

9   they don't want to talk about, which is substantial

10  compensation for what the settlement terms, mental

11  impairment 1.5 and mental impairment 2, which map

12  onto early dementia and moderate dementia.

13         Those are the conditions that are

14  major injuries that are currently associated with

15  CTE.  Those are compensated by the settlement going

16  forward.

17         And I think you're in a situation

18  where -- imagine somebody, they also like to make a

19  big deal out of the fact, well, at the complaint

20  stage everybody was talking about CTE and it sort

21  of dropped out of the case.

22         But I don't think that would be any

23  different if you had a case in individual

24  litigation, because right now, and even probably in

1    the future, just walking into court and saying

2    well, I think I have CTE, I would like

3    compensation, I mean that's not the way the

4    litigation system works.

5              The way the litigation system works is

6    to ask the question, okay, you have a pathology,

7    that's CTE, but how have you been injured?

8              And just the same way if I think, if

9    somebody somehow says that some industrial

10   workplace produces Alzheimer's, but I'm somebody

11   who potentially could be diagnosed with Alzheimer's

12   after the fact but have no symptoms, I don't think

13   I can go into court and get any compensation with

14   my Alzheimer's claim.

15             What I'd need to show is the kind of

16   injuries that would give rise to a compensable

17   injury.

18             And the way the settlement works, it

19   provides compensation for those qualifying

20   diagnoses, whether or not they're linked to CTE.

21   And ALS is a great example.

22             ALS is -- you know, this wasn't just a

23   CTE suit.  This was a suit, a number of suits

24   brought by football players for injuries that they

```
 1    claimed were linked to repetitive concussions or

 2    MTBI, and one of those is ALS.

 3              THE COURT:  When did the science prove

 4    that there was a connection between concussive hits

 5    and ALS?

 6              MR. CLEMENT:  I'm actually not sure of

 7    that.  And I think that even on those issues I

 8    don't know that the science is fully developed.

 9              But the league was essentially in a

10    position to say that as to ALS that we're going to

11    provide compensation under the settlement and we're

12    going to do it, whether or not it ends up being

13    linked to CTE or anything else.

14              And in a similar way I think this is

15    also important, is that there's a demonstrated

16    history here of the league and, through the

17    collective bargaining process, of providing

18    expanded benefits to retired players when the

19    situation changes.

20              And so fully apart from this

21    lawsuit --

22              THE COURT:  That's what I was going to

23    ask you.  Is part of this buying labor peace?

24              Because what you just said a minute
```

1    ago sounded a lot like there's sets of

2    over-inclusion in terms of the qualifying

3    diagnosis.  Would you agree with that?

4                MR. CLEMENT:  I think this is a

5    sufficiently generous settlement that I think you

6    could think about it as being over inclusive.  I

7    think that --

8                THE COURT:  And weren't your clients

9    willing to do that because the settlement's in

10   everyone's interest, move forward, get it behind

11   us, et cetera?

12               MR. CLEMENT:  The settlement's in

13   everyone's interest.  And part of it too is, I mean

14   we also want to work in the art of the possible.

15               And so we want to provide compensation

16   in a way that's going to be responsible but also

17   isn't going to -- we don't want there to be

18   compensable conditions that are very hard to

19   diagnose because it creates this sort of potential

20   for manipulating the settlement process.

21               I think that's one of the reasons --

22               THE COURT:  That's why the over

23   inclusion doesn't extend to depression, mood --

24               MR. CLEMENT:  Mood and depression.

1    That's not something we forgot about.

2                THE COURT:  You weren't willing to go

3    there.

4                MR. CLEMENT:  We weren't willing to go

5    there and we weren't willing to go there for the

6    reason that you typically have defendants not

7    willing to go somewhere in terms of a settlement,

8    which is we thought, although all of these claims

9    have problems, every one of them, in our view every

10   one of them is preempted, just to be clear.

11               But when you think about the causation

12   problems you would have proving a mood and

13   depression claim and linking it to the hits that

14   you took in football.

15               Because, first of all, you've got

16   everything -- we're all at risk of suicide, we're

17   all at risk of mood and depression from a hundred

18   things.

19               So then you take -- the other

20   compounding factor here of course is there are

21   football related risks that have nothing to do with

22   the hits you take.

23               I mean if you took any group of

24   people, I don't care if they're investment bankers

Case: 15-2206    Document: 003112145227    Page: 109    Date Filed: 12/03/2015

1    or actors or football players, and you pay them a

2    lot of money for a few years and you give them

3    constant media coverage for a few years, and then

4    after that you don't pay them that money and the

5    media doesn't really cover them anymore, I would

6    think that there would be some correlation to mood

7    and behavioral problems as a result of that.

8              So the idea that these claims that

9    weren't compensated, was there anything arbitrary

10   about that or we forgot that there was something

11   suggesting that was associated with CTE?  No.

12             I mean they were claims that we

13   thought would be very, very hard for them to prove.

14             I do want to circle back to how this

15   relates to kind of labor peace though, which is, I

16   do think, especially in thinking about the future

17   problem of what if the science changes.  I mean

18   this is different from your normal class action.

19             In your normal class action the

20   plaintiffs are, but for the litigation, are

21   essentially strangers to the defendants.

22             If you buy a truck from somebody and

23   the gas tank's in the wrong place, chances are you

24   buy your next truck from somebody else and have

1    nothing to do with that person.

2            But with respect to this class and

3    these plaintiffs and these defendants, there is a

4    sense of responsibility the NFL has to the retired

5    players when the 88 plan and the neurocog benefits

6    that are provided wholly independent of this and

7    preserved by this, which is something else that

8    wouldn't happen in litigation, those benefits came

9    through a process of collective bargaining.

10            They were something that was provided

11    when essentially the situation changed.

12            So I'm not here to make any

13    representations about what's going to happen in the

14    future.

15            I'm just saying that you have this

16    ongoing relationship, and part of that, and the

17    very fact that there were benefits provided by the

18    collective bargaining agreement of course gets you

19    back to the preemption defense, which is this is

20    unlike most other litigation.

21            You do have this relationship.  The

22    manifestation of that relationship is the vast,

23    vast majority of the class members were subject to

24    a collective bargaining agreement.

1              We had preemption defenses that went

2     to every single member of the class, maybe that a

3     couple people were in the league at a time when the

4     collective bargaining agreement had lapsed.

5              But even as to them we had an argument

6     that went to preemption for them.

7              And all of that, despite all of those

8     risks of an absolute zero recovery, you had

9     compensation here.  I would like to say one last

10    thing about the CTE issue.

11             Because I do think that there is --

12    they raise the concern about not compensating the

13    people prospectively and compensating the people

14    who are deceased before the final settlement date.

15             As Judge Brody found, there's been a

16    lot of discussion about a lot of things but not

17    enough discussion of what Judge Brody found,

18    because her findings are reviewed for deference, if

19    they're factual findings it's for clear error.

20             What she found is that the people who

21    died before the final approval date were different

22    from everybody else in two ways.  One, because they

23    died they could be definitively diagnosed.

24             But second and equally important,

1   those individuals were not on notice that they had

2   to get a medical diagnosis that was a qualifying

3   diagnosis, and reconstructing that after the fact

4   is fraught with difficulties.

5           So what she used is those are a proxy.

6   That what they got was a proxy for the qualifying

7   diagnoses.

8           Now, going forward you get the

9   qualifying diagnoses.  With the exception of mood

10  and behavior which we talked about, you get

11  compensation for the things that the science

12  currently associates with CTE.

13          You also get something else that

14  hasn't been mentioned nearly enough here, which is

15  you get the baseline assessment program, the BAP,

16  which is part of the settlement.

17          And that not only gives you sort of an

18  assessment of where you are, but particularly if

19  you have what the settlement deems impairment level

20  one, you get a suite of benefits right from that

21  that helps you with counseling, that helps you with

22  prescription medicine.

23          So obviously we're concerned about

24  people prospectively, and we don't want there to be

1    sick people in the future that have the kind of

2    behavioral problems and the like.  But it's not

3    like the settlement does nothing for them.

4           And Judge Ambro alluded to the various

5    ways of slicing and dicing this, 89 percent or 17

6    percent, or whatever the percentage of people who

7    aren't going to get benefits under this.

8           I mean part of the answer is if you

9    make it all the way through this and you don't have

10   one of the qualifying diagnoses, that sounds like a

11   pretty good deal.

12          But the second thing is everybody is

13   going to benefit from the baseline assessment

14   program, every single class member.  And that's

15   something that wasn't available to the people who

16   were deceased before the settlement date.

17          So there are differences here in the

18   way they're treated, but they reflect reality.  And

19   it's not like Judge Brody didn't focus on this like

20   a laser beam.

21          Thank you.

22          THE COURT:  Thank you very much.

23          Mr. Molo or Mr. Gupta.

24          Mr. Gupta is on the record.

1          MR. GUPTA:  I'm going to try to make

2     three quick points.  The basic takeaway is a

3     settlement, yes, but not this settlement, not with

4     basic structural assurances of fairness.

5               And the first point I want to talk

6     about is the substantive disparity, which you asked

7     about, why this stark dividing line.  And I think

8     you got two answers.

9               From Mr. Issacharoff, from Professor

10    Issacharoff you heard that this was a humanitarian

11    exception, which I think is an acknowledgment that

12    it is a deviation from what you would expect and

13    there needs to be --

14          THE COURT:  Humanitarian exemption

15    needs to cover what, 50 or 60 players; is that

16    right?

17          MR. GUPTA:  You know, I don't know the

18    total number of players but --

19          THE COURT:  Was I correct as a matter

20    of fact Mr. Mackey was one of them, or am I

21    incorrect?

22          MR. GUPTA:  I think that's right.

23    That's right.

24               But the point is the argument that I

1    think you heard from both Mr. Issacharoff and

2    Mr. Clement is that this is an approximation of

3    what they would get under the terms of the deal so

4    there's nothing awry here.

5              And the problem with that is if you

6    look at class counsel's own estimates that's not

7    correct.

8              Those are at appendix 1573.  They say

9    the average payment for the people in that first

10   group, the group for which the exception is made,

11   is 1.4 million.

12             But for those, for those who get what

13   they say is a proxy, the dementia diagnosis, it's

14   190,000.

15             So the difference between those two

16   awards is many, many times different.  It's I think

17   seven times different.  And that is a disparity

18   that can't be explained, and there is no

19   explanation for it.

20             I want to make sure that the court

21   understands the 72 percent number that's been

22   batted around.  You can find that at appendix 1585.

23   I urge the court to take a look at that exhibit.

24             That's a projection, class counsel's

1    own projection of how many people will get nothing

2    in the future.  Right?  It's not how many people

3    are eligible for qualifying diagnoses.

4              That's the percentage of the class

5    that they say will not get any qualifying

6    diagnosis.

7              THE COURT:  But that projection could

8    change.

9    A.    It could change.  Right.

10             MR. GUPTA:  The projection could

11   change a little bit.

12             THE COURT:  Could change a lot.  We

13   don't know how much it will change.

14             MR. GUPTA:  That projection isn't

15   based on the science around CTE, right?  That

16   projection is about these qualifying diagnoses.

17             And so it doesn't address the

18   conditions that are associated with CTE, which

19   aren't even compensated under the settlement by

20   definition.

21             THE COURT:  All the more reason that

22   ten years from now that may change significantly.

23             MR. GUPTA:  Right.  Exactly.  I think

24   the change in science is a point in our favor,

1   right?

2          That's a point that Georgine and

3   Amchem make, that if you had somebody negotiating,

4   and this brings me to the structural point that I

5   want to make.

6          If you had somebody negotiating for

7   these people, they would negotiate for a deal that

8   kept pace with science.

9          So on the structure.  Why wasn't there

10  a good structure to represent these people?  There

11  is no explanation, you heard really, about why they

12  couldn't go to the judge.

13         I'm sure the judge could have found

14  someone qualified to represent -- to provide true

15  independent representation for these folks.

16         THE COURT:  You mean the 72 percent?

17         MR. GUPTA:  Right.  Exactly.  For

18  those people.  Those people should have been

19  represented.

20         THE COURT:  You have a subclass that

21  says if somebody doesn't have a qualifying

22  diagnosis today but has it tomorrow, that subclass

23  is covered, and tomorrow there is a mechanism in

24  the settlement for dealing with them, correct?

1          MR. GUPTA:  Right.  But the problem

2    with that is that subclass wasn't created until

3    after the qualifying diagnosis framework was set

4    up.

5          So after the deal was already hashed

6    out, the same lawyers appointed one of their own to

7    say that that person was --

8          THE COURT:  But a person not covered

9    today who tomorrow, based on this baseline

10   assessment, for example, or going to his own

11   doctor, has a qualifying diagnosis, that person

12   will be covered under this settlement.

13         MR. GUPTA:  If the person has a

14   qualifying diagnosis, that's right, Your Honor.

15   But the problem is the qualifying diagnosis

16   framework doesn't address CTE, which is what the

17   litigation was all about.

18         It doesn't include the mood disorders

19   that are part of CTE.  It doesn't include

20   compensation --

21         THE COURT:  At the end of the day

22   there's a huge disagreement regarding the scope of

23   the qualifying diagnoses.

24         MR. GUPTA:  That's right.

1        THE COURT:  They say it's just right,

2   you say it doesn't cover nearly enough.

3        MR. GUPTA:  Right.  And you're going

4   to have -- when you look at a settlement someone's

5   always going to say you could have done better,

6   someone's going to say this is good enough, and

7   those are hard questions to decide, right?

8        And that's why I think the case law

9   that's developed, particularly in this circuit,

10  looks at whether there are structural assurances of

11  fairness, because that is something you can sink

12  your teeth into.

13       And the problem here is that you

14  didn't have truly independent representation for

15  those folks.  And there's no good answer for why

16  they couldn't go to the judge and get someone to do

17  that.

18       And finally, and I just want to make

19  as a point of personal privilege, Mr. Issacharoff

20  said I said something that's not true.

21       I'm not representing to the court that

22  Mr. Levin is currently representing clients that

23  have a qualifying diagnosis.  I don't know that.

24       We presented to the court in our

1    judicial notice motion those complaints, so you can

2    see he's unquestionably representing people who

3    claimed present injuries, while simultaneously

4    representing the future subclass.

5           And finally just on the point of fees.

6           There's no good reason, and I don't

7    think you've heard from the other side, why you

8    couldn't have supplemental fee applications, why

9    you can't do, as this court said in GM Trucks, make

10   the fee application part of any thorough

11   consideration of a supplement, but if there's

12   additional work you can have a mechanism for

13   supplemental fee applications.

14          That happens all the time.

15          What you have never seen is a court of

16   appeals approving a complete deferral of any

17   consideration of fees as part of a settlement.

18          THE COURT:  Is there anything that

19   requires that the fees must be considered at the

20   same time of the settlement?

21          MR. GUPTA:  What Judge Posner in

22   the Seventh Circuit has said is that if you read

23   23(h) --

24          THE COURT:  In dissent, right?

```
 1              MR. GUPTA:  No.  That's a majority

 2    opinion.  That's a recent --

 3              THE COURT:  It may be -- okay, I

 4    understand what his reasoning is.  But beyond that,

 5    what else?

 6              MR. GUPTA:  What Judge Posner was

 7    saying was that if you read Rule 23(h) and Rule

 8    23(e) in conjunction with one another, they require

 9    that the objectors have the right to object to the

10    settlement and to a fee application.

11              The fees are an integral term of any

12    settlement.

13              THE COURT:  In the district court.

14    Was that done in the district court?

15              MR. GUPTA:  It was not done in the

16    district court.  The district court said --

17              THE COURT:  So what should we do about

18    that now?  How could this court have been wrong on

19    that if it wasn't even presented to it?

20              MR. GUPTA:  I think the error occurred

21    when the district court approved the settlement

22    without a fee application.

23              THE COURT:  Was there any objection in

24    the district court at all?
```

```
 1                  MR. GUPTA:  There was not.

 2                  THE COURT:  And there were 83

 3      objections filed in this case.

 4                  MR. GUPTA:  Right.  But the objectors,

 5      of course, couldn't complain --

 6                  THE COURT:  And 84 could have been,

 7      and that's a big number.

 8                  MR. GUPTA:  That's right.  But at the

 9      time the objections were filed, of course, the

10      objectors couldn't know that the judge was going to

11      approve the settlement without requiring a fee

12      application.

13                  THE COURT:  So why was that not a

14      waiver?

15                  MR. GUPTA:  I think it's not a waiver

16      because the error occurred at the time that the

17      district court approved the settlement.

18                  THE COURT:  Was there a motion for

19      reconsideration filed?

20                  MR. GUPTA:  There wasn't, and I think

21      there should have been, and that's too bad.

22                  THE COURT:  Well, that's a forfeiture.

23                  MR. GUPTA:  It's a lot like the

24      Mercury case from the Ninth Circuit which I urge
```

1    you to take a look at, Judge Posner cites it.

2              In that case the court said, look,

3    this wasn't raised below, but we have to address it

4    because it's a critical question of class action

5    governance.

6              If we don't address this and say that

7    this is not okay, prospectively you're going to

8    have settlements that are approved without even a

9    fee application.

10             And that goes critically to adequacy

11    of representation and assessment of what the

12    lawyers did, whether they earned their fee.

13             And before you approve a settlement

14    with $113 million that nobody is going to contest

15    down the road, you at least ought to have a fee

16    application.

17             THE COURT:  I thought what you were

18    going to say in response to our questioning on this

19    was that regardless whether you consider it a

20    waiver or regardless whether you consider it a

21    forfeiture, it's a structural problem.

22             MR. GUPTA:  Exactly.  That's what I'm

23    trying to say.

24             THE COURT:  But you didn't say that.

```
 1              MR. GUPTA:  You said it better than I

 2   did.  It goes to the heart of the settlement.  It's

 3   an integral term of the settlement.  You cannot

 4   approve it without considering that.

 5              And of course the other side hasn't

 6   claimed waiver in their briefs, and it's up to you

 7   to decide, prudentially of course, you can consider

 8   it and I think you should.

 9              Thank you.

10              THE COURT:  Thank you very much.

11   Mr. O'Brien.

12              MR. O'BRIEN:  Thank you.  I want to

13   talk about preemption because we raised it in our

14   briefs.

15              And our position on preemption is it

16   seems to be a subject matter jurisdiction issue.

17   And we shouldn't have the NFL saying, Hey, you're

18   preempted, the settlement's fair enough.

19              Either they are not preempted or they

20   are preempted.  And we specifically asked this

21   court.

22              THE COURT:  I'm lost.

23   A.    Why is that?  No.

24              THE COURT:  I'm lost.
```

```
 1    A.     Even if they think they have a 90 percent

 2    chance of prevailing on their preemption argument,

 3    they might see value in settling the case because

 4    the potential damages are so high, not to mention

 5    the specter of the value of the legal fees that

 6    they would continue to incur for some 5,000 cases.

 7              MR. O'BRIEN:  Our position, Your

 8    Honor, is that either this court has subject matter

 9    jurisdiction or it doesn't, and it has an

10    independent duty to determine subject matter

11    jurisdiction.

12              And if preemption is raised as a

13    subject matter jurisdiction bar, then it has to be

14    addressed and it shouldn't be used to discount.

15              THE COURT:  And no settlement can

16    occur when a defendant --

17              MR. O'BRIEN:  No.  I think the

18    preemption defense fails.  It fails.  And we --

19              THE COURT:  Nobody ruled on it.  The

20    judge didn't rule on it.

21              MR. O'BRIEN:  But what they're saying

22    is that because it wasn't ruled on, maybe they

23    would have won.  Therefore --

24              THE COURT:  No.  What they're saying
```

1    is they thought they had a strong argument and they

2    decided ultimately, at the suggestion of the court,

3    to go to the negotiating table.  I mean that sounds

4    like --

5    A.    Standard fare.

6                THE COURT:  Standard fare.

7                MR. O'BRIEN:  Okay.  Our position is

8    that the court has a duty to determine that there

9    is no preemption.

10               Regarding Daubert --

11               THE COURT:  Was anything mentioned on

12   Daubert?

13   A.    No.

14               MR. O'BRIEN:  Yes.  If you don't want

15   to hear from me, that's fine.

16               THE COURT:  I don't think there's

17   anything to rebut.  You handled it pretty well on

18   your opening.

19               MR. O'BRIEN:  Okay.  Thank you, Your

20   Honor.

21               THE COURT:  Thank you.

22               MR. BECKER:  Your Honor, may I rise

23   for (indistinguishable)?

24               THE COURT:  Sure.

```
 1              MR. BECKER:  Thank you.  Just

 2    following up on preemption, I understand and agree

 3    that there is a meaningful preemption argument in

 4    the case.

 5              But in the end the NFL isn't paying,

 6    Judge, to your point, they're not paying hundreds

 7    of millions of dollars simply because they thought

 8    they might win.  They're also paying because they

 9    thought they might lose.

10              And because even if they did win, in

11    the end these cases just go to arbitration and the

12    liability is still there.

13              THE COURT:  It sounds like why you

14    have settlements.

15              MR. BECKER:  That is why we have

16    settlements.

17              And at the end, and so the Girsh

18    factor analysis and the Prudential factor analysis,

19    even accepting the significant force of points made

20    by Mr. Clement, argues in favor of settlement or

21    argues in favor of some global resolution of this

22    thing, but not on the back of 15,000 people who

23    will get nothing.

24              THE COURT:  All right.  Thank you.
```

Case: 15-2206    Document: 003112145227    Page: 128    Date Filed: 12/03/2015
THIRD CIRCUIT, 11/19/15

```
 1              Mr. Molo.
 2              MR. MOLO:  Thank you very much.  I
 3    just want to pick up on the point Mr. Clement made,
 4    which is -- the fundamental question is, did the
 5    class get good value?
 6              And the answer is some of the class
 7    got good value, but the class as a whole, and
 8    particularly those who have future claims for CTE
 9    did not get good value.  There's no question --
10              THE COURT:  It sounds like 99 percent
11    of the class is willing to accept the value that's
12    been offered.
13              MR. MOLO:  Well, that doesn't mean
14    that it's a fair settlement.  And in fact the NFL
15    has assigned a significant value to these future
16    CTE claims by insisting on CTE in the release.
17              And when we talk about these advances
18    in science and the fact that there's not more often
19    than once every ten years there's supposed to be
20    this revisiting of the settlement, it specifically
21    in Section 66(b) excepts CTE, changing CTE as a
22    qualifying diagnosis.
23              So there's clearly -- clearly a value
24    that has been placed on CTE by the defendant and --
```

```
 1    the future claims of CTE, and they've compensated
 2    it with an award of up to $4 million now.
 3                And this idea of the dementia
 4    diagnosis somehow satisfying an obligation to deal
 5    with people with CTE is just not true.  First of
 6    all, as we point out in the brief, there's a chart
 7    that lays it out.
 8                People with Stage I and II CTE, which
 9    are equally dangerous to III and IV in certain
10    respects, get nothing.
11                And if you rise to the level of Stage
12    III and IV of CTE and then qualify under either of
13    these two dementia diagnoses, the amount of the
14    awards are quite a bit less.
15                At the end of the day, Judge Brody did
16    try very hard.  And I want to say, frankly, that
17    the class counsel and the NFL tried very hard.
18                Yes, there were procedural and
19    structural defects.  Whether they're there or not,
20    the settlement is unfair.
21                And so I think that that should be the
22    starting point.  We look at those distribution
23    terms.  And we ought to go back to the district
24    court, she can decide whether or not to appoint
```

```
 1    counsel to pursue the CTE claims.

 2              Maybe our motion that we had filed to

 3    intervene, which started all of this off, would be

 4    revisited and we would be allowed leave to

 5    intervene.

 6              Or maybe the parties can just come up

 7    with a solution to CTE, like they did for the NFL

 8    Europe issue, themselves.  But in any event, this

 9    settlement can't stand.

10              We appreciate the time this morning.

11    This has been a very generous allotment of the

12    time.  I'm sure I'm speaking for all the parties

13    when I say that.  Thank you very much.

14              THE COURT:  And I want to thank all

15    counsel for extremely well presented arguments,

16    without fail.

17              I would ask that if you would get

18    together with the clerk's office, have a transcript

19    prepared of this oral argument.  And I would ask

20    that it be split evenly, half for this side, and

21    then if the NFL would pick up the other half.

22              Thank you very much.

23

24
```

```
 1                        CERTIFICATION

 2

 3            I, JAMES DeCRESCENZO, a Fellow of the

 4   Academy of Professional Reporters, a Registered

 5   Diplomate Reporter, Certified Realtime Reporter, an

 6   Approved Reporter of the United States District

 7   Court and the Court of Common Pleas, hereby certify

 8   that I have truly and accurately transcribed this

 9   recording to the best of my ability.

10            I further certify that I am neither

11   attorney nor counsel for, not related to nor

12   employed by any of the parties to this action; and

13   further, that I am not a relative or employee of

14   any attorney or counsel employed in this action,

15   nor am I financially interested in this case.

16

17

18

19   _____

20   James DeCrescenzo
     Fellow of the Academy of Professional Reporters
21   Registered Diplomate Reporter
     Certified Realtime Reporter
22   Approved Reporter of the United States District
     Court and the Court of Common Pleas
23

24
```

**JAMES DeCRESCENZO REPORTING, LLC**